CHEN v WAYNE STATE UNIVERSITY

Docket Nos. 283420 and 283575. Submitted May 12, 2009, at Detroit. Decided June 2, 2009, at 9:10 a.m.

Dr. Kuo-Chun Chen brought an action in the Wayne Circuit Court against Wayne State University, seeking damages and other relief related to his treatment while working as a professor and to the University's handling of his personal property and a patent. The plaintiff specifically alleged that he was discriminated against because of his national origin, age, and a disability and that he was retaliated against for protesting the discrimination. He also pleaded a claim and delivery count seeking the return of his personal property, a count alleging violation of the Freedom of Information Act, MCL 15.231 *et seq.*, and a count alleging breach of contract. The plaintiff stipulated the dismissal of the counts for breach of contract and claim and delivery, and the court, Robert L. Ziolkowski, J., dismissed those claims without prejudice. The plaintiff then filed those claims in the Court of Claims. At some point, the case in the Court of Claims was consolidated with the case in the circuit court and Judge Ziolkowski heard both cases. The plaintiff was permitted to amend his complaints, but he did not state a claim based on the Freedom of Information Act. The Court of Claims then dismissed the claims of breach of contract and claim and delivery, but allowed the plaintiff to amend the complaint in the Court of Claims action to add as defendants the current chairperson and two former chairpersons of the University's department of biological sciences and to allege gross negligence against the individuals and negligence against the University with regard to the handling of the plaintiff's property. The Court of Claims then dismissed the negligence claims against the individual defendants and, on May 16, 2006, entered an order dismissing the negligence claim against the University. The order stated that the order resolved the last pending claim in the Court of Claims and closed the case. Judge Ziolkowski dismissed the circuit court claims on March 15, 2007, and denied reconsideration of that order on May 3, 2007, and May 8, 2007. The Court of Appeals dismissed the plaintiff's appeals in both cases for lack of jurisdiction because they were not timely filed. Unpublished orders of the Court of Appeals, entered August 30, 2007 (Docket

Nos. 278332, 278333). The plaintiff applied for leave to appeal both cases, and the Court of Appeals granted leave to appeal both the circuit court order (Docket No. 283420) and the Court of Claims order (Docket No. 283575) in unpublished orders entered August 20, 2008. The appeals were consolidated.

The Court of Appeals *held*:

1. The consolidation of the two cases at the trial court level did not merge the two cases and both retained their separate identities. Therefore, the time to appeal each individual case is determined by reference to the final judgment or order in each case. The application for leave to appeal the Court of Claims case was not filed within one year of the May 16, 2006, final order in that case, as required by the version of MCR 7.205(F)(3)(a) in effect at the time the application was granted. Therefore, the Court of Appeals did not have the discretion to grant the application. The appeal in Docket No. 283575 must be dismissed for lack of jurisdiction. The application for leave to appeal the circuit court case, Docket No. 283420, was timely filed.

2. The plaintiff was required to show that he suffered an adverse employment action in order to establish his discrimination and retaliation claims under the Civil Rights Act, MCL 37.2202(1) and 37.2701. An adverse employment action must be materially adverse to the employee, that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. Materially adverse employment actions are akin to the termination of employment, a demotion shown by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. There must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling.

3. There was no objective evidence presented to show that the alleged refusal to assign the plaintiff a new lab constituted an adverse employment action.

4. The plaintiff failed to present any evidence that a department chairperson's threat to revoke the plaintiff's tenure resulted in a materially adverse change in the terms or conditions of his employment. The threat did not rise to the level of an adverse employment action.

5. There was no evidence that the changes that occurred to the plaintiff's teaching duties amounted to an adverse employment action.

6. There was no evidence that a department chairperson's actions or omissions with regard to not restoring the plaintiff's regular graduate faculty status or allowing the plaintiff to supervise a graduate student had any effect on the plaintiff's employment.

7. The plaintiff abandoned on appeal his claims regarding merit increases and other miscellaneous adverse actions.

8. The circuit court did not err in granting summary disposition in favor of the University with regard to the claims based on discrimination and retaliation. The order in Docket No. 283420 must be affirmed.

Appeal in Docket No. 283575 dismissed and order appealed in Docket No. 283420 affirmed.

1. ACTIONS — CONSOLIDATION OF ACTIONS — APPEAL OF CONSOLIDATED ACTIONS.

Where two cases involve claims that could not have been brought as separate counts in a single complaint, but are nevertheless consolidated for administrative convenience, the consolidated cases are not merged and both cases retain their separate identities; a circuit court case and a Court of Claims case that are joined for trial are not merged and both cases retain their separate identities, and the time to appeal each case must be determined by reference to the final judgment or order for each case (MCL 600.6421).

2. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — ADVERSE EMPLOYMENT ACTIONS.

A plaintiff who brings a discrimination or retaliation claim against an employer under § 102 or § 701 of the Civil Rights Act must establish that he or she suffered an adverse employment action; what might constitute an adverse employment action in one employment context might not be actionable in another; an employment action must be materially adverse to the employee, not a mere inconvenience or minor alteration of job responsibilities in order to be actionable; there must be an objective basis for demonstrating that an employment action was adverse because an employee's subjective impressions are not controlling (MCL 37.2202, 37.2701).

*Eisner & Mirer, P.C.* (by *Jeanne Mirer* and *Eugene Eisner*), for the plaintiff.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Donna J. Donati* and *Megan P. Norris*), for the defendants.

Before: BORRELLO, P.J., and MURPHY and M. J. KELLY,
JJ.

PER CURIAM. In these consolidated appeals, plaintiff
Dr. Kuo-Chun Chen appeals by leave granted the trial
court's orders granting summary disposition in favor of
defendant Wayne State University (the University). In
Docket No. 283420, Chen argues that the trial court,
which was sitting as the circuit court, erred when it
dismissed under MCR 2.116(C)(10) Chen's claims of age
and national origin discrimination and retaliation. In
Docket No. 283575, Chen argues that the trial court,
which was sitting as the Court of Claims, erred when it
refused to permit him to amend his complaint to add
new parties and new theories of recovery. We conclude
that we lack jurisdiction to hear Chen's claims of error
in Docket No. 283575 and that the trial court did not err
when it dismissed Chen's claims in Docket No. 283420.
For these reasons, we dismiss the appeal in Docket No.
283575 and affirm in Docket No. 283420.

### I. FACTS AND PROCEDURAL HISTORY

#### A. BASIC FACTS

This case has its origins in the progression of Chen's
career at the University over a period of more than 25
years. Chen is a citizen of the United States, but was
born in China and speaks English with a Chinese
accent. The University hired Chen as an associate
professor for its department of biological sciences in
1968. Chen's field of study is genetics. He became a
tenured associate professor in 1971.

Before joining the University's faculty, Chen began
the development of a device, which he called the Micro-

wave Guide Exposure System (the Microwave Device), with his former roommate at graduate school. Chen completed the Microwave Device with the help of others after he joined the University. He assigned his patent rights to the University, which obtained a patent for it in 1982. The University released the patent to Chen in 1995.

Chen apparently did not have any serious difficulties at the University until after Dr. Albert Siegel became the department's chairperson in 1972. Dr. John Taylor, who joined the department's faculty in the same year as Chen, testified that Chen apparently did not like Siegel. Taylor said that Siegel treated Chen as though he were a "pseudo molecular biologist" and believed that Chen's courses were "out-of-date or just plain wrong." Indeed, Taylor stated that Siegel and some other faculty members had their graduate students leave Chen's courses. In a memo written some years after Siegel's chairmanship, Taylor stated that Siegel tried to "change [Chen], then isolated him and then gave up." Siegel testified that the problems he had with Chen were related to Chen's ability to get things done on his own. Siegel explained that other professors who had inadequate space worked hard at improving their space, "got their research programs well funded and started right in working and attracting graduate students and did the best they could under the circumstances." Siegel stated that the problem with Chen was that he "was not of that nature. He didn't try to help himself."

Chen testified at his deposition that Taylor was apparently jealous of Chen's achievements and status and alleged that Taylor used his position to impede Chen's efforts at the University. Specifically, Chen noted that Taylor was apparently bothered by the fact that the University hired Chen as an associate professor

whereas the University hired Taylor as an assistant professor. Although Chen started as an associate professor, Taylor eventually surpassed Chen and became a full professor. In addition, in 1974, Taylor replaced Siegel as the department's chairperson.

Taylor testified that he was not jealous of Chen and that he and Chen were originally friends. He stated that they spent a significant amount of time together when they first joined the University. Taylor also stated that he supported Chen by acting as an intermediary in the acquisition of devices for Chen's lab. Taylor testified that, after he became the department's chairperson, he met with Chen and recognized that Chen had inadequate lab space. Taylor stated that he tried to help Chen by moving him to a better lab and also tried to obtain funds to modernize Chen's lab. However, he was unable to help Chen because Chen's "tastes were always better than what I could afford" and Chen would not compromise. Taylor stated that he eventually gave up trying to help Chen.

Chen also testified that Taylor was biased against him because of his Chinese national origin, which was shown by the fact that Taylor referred to him as being "Chinese Mafia." Taylor admitted that he had used the phrase "Chinese Mafia," but said that he did not direct it at Chen. Taylor explained that Chen had asked him for assistance in a business matter involving his brother-in-law, who lived in Taiwan. Taylor stated that he referred Chen to a friend who was Chinese for help with the business matter. Taylor said that his friend called him and indicated that Taylor and Chen might want to avoid dealings with Chen's brother-in-law. After that, Taylor stated that he would use the phrase "Chinese Mafia" in connection with discussions concerning Chen's brother-in-law.

Dr. David Adamany, who was the University's president, testified that Taylor was a productive researcher and that he was appointed to chair the department in an effort to strengthen the department's research program. Adamany stated that faculty members who were not active researchers resisted Taylor's efforts. He stated that the relations between Taylor and those faculty members eventually deteriorated to the point that the department was no longer able to make progress on improving research. Dr. Robert Arking testified that he was a full professor in the department and that he had served on various committees. He stated that Taylor had favorites on the faculty and that Chen was not one of them. Arking said that the faculty committee eventually asked Taylor to step down as chairperson because of issues with hiring, the budget, and faculty relations.

About 1980, Chen requested a promotion to full professor. Chen testified that Taylor handled the request and deliberately refused to submit Chen's request to the faculty. Chen admitted that there was an advisory committee that considered his request, but stated that Taylor controlled this committee. Arking testified that it was possible to get promoted without the support of the chairperson, but that it would be more difficult. Taylor stated that the committee considered Chen's promotion to full professor in 1980 and 1981 and decided not to recommend promotion to the faculty in both years. Taylor stated that he did not oppose Chen's promotion.

Chen testified that he also had a condition that caused an irregular heartbeat. According to Chen, starting in about 1980, the stress of his job triggered problems with his condition. Chen stated that this condition sometimes interrupted his work and that he even collapsed once during class and had to be rushed to

the hospital. Chen testified that Taylor was aware of his condition. He ultimately had the condition surgically corrected in 1991.

In 1987, Siegel again briefly served as the chairperson for the department. During that time, Siegel wrote a memo to Chen noting that Chen had made a conscious decision to stop researching and advising Chen that, for that reason, he would have to teach more classes. Siegel testified that after he assigned Chen more classes, there was a constant stream of complaints by undergraduate students concerning the students' ability to understand Chen. On the basis of these complaints, Siegel recommended that Chen seek help at the University's English Language Institute, but Chen refused. Siegel stated that Chen did not acknowledge a problem and blamed the students.

Dr. Stanley Gangwere replaced Siegel as the department's chairperson later in 1987. Gangwere testified that Taylor was a controversial chairperson and, for that reason, he tried to "separate" himself "from any association" with Taylor's policies. Chen testified that Taylor appeared to have a good relationship with Gangwere. Chen further testified that, from the beginning, Gangwere refused to support him and Chen opined that this must have been the result of Taylor's influence over Gangwere. Gangwere stated that Taylor did not advise him and that he had official and unofficial complaints about Chen by students concerning their ability to understand Chen's English.

In 1988, the University began a renovation and construction project. To accommodate the renovations, the department temporarily rearranged the lab and office assignments for the faculty. Gangwere asked Chen to vacate his current lab and office so that Taylor could occupy it along with some adjacent space that

Chen had requested earlier. Gangwere temporarily assigned Chen space in the natural sciences building. Because the new lab space was smaller, Gangwere gave Chen, as he did every professor, the option of placing some of his property in storage for the duration of the renovation. Chen elected to have his Microwave Device placed into storage.

Chen disliked the new lab and refused to use it. He indicated that the lab was too small and had large vent fans that made it unacceptable for use as a lab. Arking testified that Chen's new lab was very small, but had adequate utilities and could be used for research. Gangwere testified that almost every professor lost space during the renovation period. Indeed, Dr. Dwight Freeman testified that he too was moved during the renovation and that he was moved into an old dealership from the 1920s that was "abysmal."

The University hired Dr. P. Dennis Smith to replace Gangwere as the department's chairperson in 1989. Chen stated that Smith did not show much interest in him and, from this, he concluded that the previous chairpersons—Taylor, Siegel, and Gangwere—must have influenced Smith to form a negative opinion about him. Chen testified that Smith brought in new professors without regard to their ability to teach specific courses because it was hoped that these teachers would bring in grant money. However, when these professors failed to obtain the expected grant money, Smith assigned some of Chen's teaching responsibilities to these professors. Chen said that Smith criticized Chen's accent and indicated that he had received student complaints. Chen stated that he thought Smith wanted to take his tenure away and get rid of him.

Smith testified that he had numerous student complaints about Chen's ability to communicate. As a

result, Smith decided to sit in on one of Chen's classes. Smith wrote a memo describing his review of the class. In the memo, Smith stated that Chen appeared to know the material well but the students appeared to have trouble following the lecture. Smith also noted frustration on the part of students who attempted to pose questions to Chen. Smith testified that he advised Chen to get help from the language institute and suggested using more visual aids in teaching the course.

In 1991, the University finished its construction of its biological sciences building. Smith assigned Chen office and lab space, but Chen refused to use either room. Chen claimed that the office was contaminated from the use of radioactive isotopes in the rooms. However, Chen did not investigate whether the rooms were unusable and did not ask to have them decontaminated. Instead, Chen continued to use the office temporarily assigned to him during the renovations.[1] Smith testified that the room at issue likely was not radioactive, but had only been used for some sort of radiometric counter. He also stated that, had Chen brought up the issue with him, he would have followed up on the problem. Smith said that he thought that Chen had just given up on research. Smith also testified that he was aware that Chen refused to move and had continued to use his old office.

Chen later obtained permission from Linda Van Thiel to use another office in the same building that housed his current office. Van Thiel testified that Chen wanted the office for additional space. The office was part of a suite of offices in Room 309. She stated that the agreement was informal and that she never got permission or

---

[1] Although there was a memo clearly assigning this room to Chen, Chen testified that he was never assigned an office during the renovation. Rather, he stated that another faculty member gave him permission to use the office.

told anyone about the arrangement. She also testified that she informed Chen that if a particular funding request came through, the space would be renovated into a computer lab. She said that she informed Chen when the funding finally came through.

In July 1994, Dr. Jack Lilien replaced Smith as the chairperson. Shortly after the change, Chen sent Lilien a letter notifying Lilien that he felt he was not in a position to do research and requesting help. Chen later had a meeting with Lilien. Chen testified that he told Lilien about his past unfair treatment by previous chairpersons and told him that he did not have an office or space for research. Chen said that he initially got along well with Lilien.

Lilien testified that when he was hired as chairperson of the department he was told to refocus the mission of the department on research and the procurement of extramural funding. To that end, Lilien stated that he intended to eliminate the department lecturers to free positions for tenure-track faculty who would perform research. Lilien stated that he also evaluated the faculty and assessed whether each member was an active researcher. Lilien stated that Chen appeared to have ceased being a productive researcher in 1980. Lilien said that he met with Chen and heard Chen's concerns, but that Chen declined his offer to assign him a new lab and refused his suggestion to work with another faculty member to restart his research. After this, Lilien testified, he thought it might be best to develop a teaching plan for Chen.

Chen testified that, in 1994, a graduate student approached him about serving as the student's graduate advisor. Chen stated that he asked Lilien for permission to serve as the student's graduate advisor. As part of his request, Chen mentioned that he would need

a new lab. Chen stated that Lilien refused because Chen was not a member of the regular graduate faculty. Apparently, the University's graduate school had downgraded Chen's status to associate graduate faculty in 1990 because he had not published a paper in a number of years and associate graduate faculty were not permitted to advise graduate students. Chen testified that he was unaware that there were two ranks in the graduate faculty and was unaware that he had been demoted. After the graduate committee informed Chen that he could not advise the student, Chen stated that he decided to actively research again and asked Lilien for a lab.

In the fall semester of 1994, Chen taught an introductory genetics course. Several undergraduate students complained to Lilien about Chen's ability to teach the class. Lilien responded by asking Chen to give copies of his transparencies to the students before each class, but Chen refused. Lilien testified that students taking Chen's genetics course began to complain about Chen almost immediately after Lilien began serving as the chairperson for the department. Chen testified that the students who complained were simply unhappy with their grades and did not want to properly prepare for class. Lilien informed Chen in January 1995 that he would teach only one of the two sections for introductory genetics during the winter semester. Lilien asked a different professor to teach the other section to accommodate the students who wanted to retake the course after the problems with Chen's fall class. In February 1995, Lilien informed Chen that he would not be assigned to teach any undergraduate courses and asked Chen to work with a professor at the language institute to improve his English communication. Chen declined to get help from the professor because he felt the program could not help him improve his teaching. Lilien again asked Chen to go to get help in March 1995.

In May 1995, Lilien offered Chen the option to take an early retirement. Chen testified that he thought Lilien offered him the early retirement because he felt that Chen was too old and in poor health and, for that reason, should be replaced. Chen also said that Lilien threatened to have Chen's tenure taken away if he did not accept the early retirement offer. Arking testified that Lilien consulted with the senior faculty about offering Chen an early retirement. Arking also stated that Lilien told him he wanted Chen to retire because Chen "wasn't pulling his weight."

The department placed most graduate level genetics courses on hold in the fall of 1995 while a planning group, which apparently included Chen, developed new courses. In November 1995, Lilien gave Chen formal notification of his decision not to assign Chen to teach any undergraduate classes. Lilien explained that his decision was based on student complaints and Chen's refusal to obtain help from the language institute. The department's Salary Advisory Committee endorsed Lilien's decision later that same month. Chen then requested a review hearing under his collective bargaining agreement. A panel of Chen's peers conducted the hearing in April 1996. The panel concluded that Chen "does have a communication problem as it relates to the teaching of undergraduate students," but that the communication problem does not appear to affect Chen's graduate courses. The panel recommended that Chen be allowed to teach at least one course each semester, which should preferably be a graduate course. The panel also recommended that a panel be convened to prepare a "comprehensive program" to assist Chen "to improve his communication and teaching skills."

In March 1996, Lilien sent out two memos notifying the faculty, staff, and graduate students that the second

and third floors of the natural sciences building would soon be renovated. The notice indicated that all personal belongings had to be removed from these floors or they would be discarded. Chen indicated that he never received these memos. Chen admitted that he does not like computers and that he does not use e-mail. Chen also stated that he has had trouble receiving regular campus mail. A staff person testified that, because Chen and one other professor refused to use e-mail, she made hard copies of all memos and placed the memos into the professors' mailboxes. At the time of the notices, Chen had some personal property in an interior office in Room 309. One of the items Chen had in that office was an original manuscript of a textbook that he was preparing. In April 1996, a staff person instructed two students to remove Chen's personal property from the interior office in Room 309 and place it in storage.

In March and May 1996, Chen filed claims with the Equal Employment Opportunity Commission alleging discrimination.

In November 1996, Chen requested that the Promotion and Tenure Committee recommend that the graduate school upgrade his status from associate graduate professor to regular graduate professor. The committee declined the request and recommended that the graduate school renew Chen's status as an associate graduate professor.

In April 1997, Chen informed Lilien that his personal property from the natural sciences building was missing. He also asked Lilien to help him locate his Microwave Device from storage. A staff person testified that Chen was shown the boxes that contained the materials, but that Chen claimed that some items were missing. Chen alleged that among the items missing from the office in Room 309 was his manuscript for his textbook, which was

the only copy he had. The University was also unable to find the Microwave Device that had been placed in storage approximately eight years earlier.

Chen visited China in the summer of 1997 and met with an old acquaintance from an earlier visit. Chen testified that the acquaintance had since started a new business and was interested in purchasing his patent for the Microwave Device even though that patent was set to expire in two years. Chen produced an agreement that offered $1.75 million for the patent, but only if Chen could find the Microwave Device and reproduce his results. Because the University was unable to produce the Microwave Device, Chen was purportedly unable to consummate the agreement.

### B. PROCEDURAL HISTORY

On September 8, 1997, Chen sued the University for damages and other relief related to his treatment while working as a professor and to the University's handling of his personal property and patent. Specifically, Chen alleged that the various chairpersons discriminated against him because of his national origin (Count I), age (Count II), and disability (Count IV), and retaliated against him when he protested against the discrimination (Count III). Chen further demanded the return of his personal property—including the Microwave Device and the manuscript for his textbook (Count V for claim and delivery). Chen also alleged that the University violated the Freedom of Information Act, MCL 15.231 *et seq.*, when it failed to turn over certain documents (Count VI), and alleged that the University breached its contract with him when it failed to market his patent (Count VII).

On November 7, 1997, the University moved for dismissal of Counts V and VII of Chen's claims on the ground that the Court of Claims had exclusive subject-

matter jurisdiction over those claims. Chen conceded that these claims should have been brought in the Court of Claims and stipulated their dismissal. On November 18, 1997, the trial court entered an order dismissing without prejudice Chen's claims for claim and delivery and breach of contract. Two days later, Chen filed a complaint in the Court of Claims that restated his counts based on claim and delivery and breach of contract. At some point, Chen's case in the Court of Claims was consolidated with his case in the circuit court.

In January 2000, Chen moved to amend his "complaints" and attached a single complaint to the motion. The complaint restated his claims premised on discrimination and retaliation, which he indicated were his circuit court claims. The complaint also restated Chen's counts for claim and delivery and breach of contract. Chen alleged that the Court of Claims had jurisdiction over those counts. Chen did not state a claim based on the Freedom of Information Act. In his brief in support of his motion, Chen referred to the amended complaint as the "combined complaints." The University stipulated that the complaint could be amended, and the trial court entered an order permitting the amendment.

In July 2000, the University moved for summary disposition of Chen's counts of claim and delivery and breach of contract. The University argued that Chen failed to establish that the University had possession of his property at the time that he filed the count for claim and delivery, which is a prerequisite for establishing claim and delivery. The University also argued that, under the agreement applicable to Chen's patent, the University had no duty to market the patent. For these reasons, the University asked for dismissal of these claims with prejudice. On September 18, 2000, the trial

court entered an order dismissing Chen's breach of contract claim and taking the University's motion regarding the claim and delivery count under advisement.

On December 4, 2000, Chen moved for permission to file a second amended complaint, but only with regard to his complaint in the Court of Claims. In the second amended complaint, Chen alleged that three new defendants—all current or former chairpersons of the University's department of biological sciences—were grossly negligent in their handling of his property and that this resulted in the loss of the property. Chen also argued that the University was negligent in its handling of the same property. Chen did not restate his count based on claim and delivery.

On December 11, 2000, the University filed a motion asking the trial court to finalize its decision to dismiss Chen's count for claim and delivery. Apparently, the trial court decided to dismiss this count after a conference held in chambers on November 21, 2000.[2] The University also asked the trial court to deny Chen's attempt to amend the complaint to add a negligence count. The University acknowledged that the trial court had indicated at the conference that Chen could add the negligence count, but argued that the amendment exceeded the scope of the trial court's grant by naming new parties and by being filed after the deadline set by the trial court. On January 2, 2001, the trial court granted the University's motion to dismiss Chen's count for claim and delivery, but granted Chen's motion to amend his complaint in the Court of Claims. The trial court gave Chen until January 5, 2001, to file the amended complaint. Chen filed the amended complaint on January 9, 2001.

---

[2] The University attached two affidavits describing the conference.

On January 26, 2001, the University moved to dismiss Chen's negligence claim stated in the second amended complaint on the grounds that the University had governmental immunity and the claims against the named individuals were time-barred. In his reply to this motion, Chen argued that the University was not immune because its conduct amounted to a taking of private property for which compensation must be paid. On March 22, 2001, the trial court entered an order dismissing Chen's negligence claims against the individual defendants, but not against the University. The trial court indicated that it was taking the University's motion under advisement pending additional briefing on Chen's claim that the University's actions amounted to a taking.

On May 16, 2006, the trial court entered an order dismissing Chen's negligence claim against the University and "dismissing with prejudice" Chen's attempt to add a claim based on takings. This order stated that it resolved "the last pending claim in the Court of Claims case No. 97-16809-CM and closes the case."

The trial court dismissed Chen's circuit court claims on March 15, 2007, and denied reconsideration of that order on May 3, 2007. The trial court entered a second order denying reconsideration on May 8, 2007. Chen appealed both cases on May 30, 2007. However, because the claims were filed more than 21 days after the May 3, 2007, order denying reconsideration, this Court dismissed both claims for lack of jurisdiction and instructed Chen to apply for leave to appeal under MCR 7.205.[3]

---

[3] See *Chen v Wayne State Univ*, unpublished order of the Court of Appeals, entered August 30, 2007 (Docket No. 278332), and *Chen v Wayne State Univ*, unpublished order of the Court of Appeals, entered August 30, 2007 (Docket No. 278333).

On February 4, 2008, Chen applied for leave to appeal the dismissal of his claims in the circuit court. The appeal was assigned Docket No. 283420. On February 11, 2008, Chen applied for leave to appeal the dismissal of his claims in the Court of Claims. That appeal was assigned Docket No. 283575. On August 20, 2008, this Court granted both applications for leave to appeal and consolidated the appeals.[4]

## II. CLAIMS IN DOCKET NO. 283575

In Docket No. 283575, Chen argues that the trial court erred when it refused to permit him to amend his complaint in the Court of Claims. Specifically, Chen argues that the trial court should have permitted him to amend his complaint to include claims that the University's handling of his personal property—including his manuscript and Microwave Device—amounted to a taking of private property for which compensation must be made. In addition, Chen argues that the trial court should have allowed him to add a claim of grossly negligent bailment against the chairpersons who allegedly were responsible for his lost property. However, before proceeding to examine these claims of error, we must first determine whether this Court properly granted leave to appeal in Docket No. 283575.

### A. APPELLATE JURISDICTION

On appeal, the University argues that this Court does not have jurisdiction over the appeal in Docket No. 283575. The University contends that the final judg-

---

[4] See *Chen v Wayne State Univ*, unpublished order of the Court of Appeals, entered August 20, 2008 (Docket No. 283420), and *Chen v Wayne State Univ*, unpublished order of the Court of Appeals, entered August 20, 2008 (Docket No. 283575).

ment in Chen's case in the Court of Claims was the order dismissing his last claim in that case, which the court entered on May 16, 2006. Because this Court may only grant a delayed application for leave to appeal within one year of entry of a final judgment, see MCR 7.205(F)(3)(a), the University argues that this Court lacked the authority to grant leave to appeal in Docket No. 283575. Whether this Court has jurisdiction to hear an appeal is always within the scope of this Court's review. *Walsh v Taylor*, 263 Mich App 618, 622; 689 NW2d 506 (2004); MCR 7.216(A)(10). Therefore, even though this Court has already granted leave to appeal, we must nevertheless review our jurisdiction before proceeding to the issues raised in Docket No. 283575.

### B. STANDARD OF REVIEW

The jurisdiction of the Court of Appeals is governed by statute and court rule. See Const 1963, art 6, § 10; *Walsh*, 263 Mich App at 622. This Court reviews de novo the proper interpretation of statutes and court rules as questions of law. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). Hence, whether this Court has jurisdiction is a question of law that this Court reviews de novo. *Id.*

### C. THE COURT OF APPEALS JURISDICTION

Under Michigan's Constitution, the jurisdiction of the Court of Appeals is that which has been "provided by law . . . ." Const 1963, art 6, § 10. The phrase "provided by law" vests the authority to act in the Legislature and does not encompass our Supreme Court's rulemaking authority. *People v Bulger*, 462 Mich 495, 508-509; 614 NW2d 103 (2000), overruled in part on other grounds *Halbert v Michigan*, 545 US 605 (2005). However, the constitution also provides that the Su-

preme Court may prescribe rules for "practice and procedure" in the Court of Appeals. Const 1963, art 6, § 10.

The Legislature has granted jurisdiction to the Court of Appeals over certain "orders and judgments which shall be appealable as a matter of right[.]" MCL 600.308(1). These include "[a]ll final judgments from the circuit court, court of claims, and recorder's court . . . ." MCL 600.308(1)(a). The Legislature also granted this Court jurisdiction over certain "orders and judgments which shall be reviewable only upon application for leave to appeal . . . ." MCL 600.308(2). Although the Legislature specifically provided jurisdiction where leave to appeal is granted for certain types of final judgments or orders, it also gave this Court jurisdiction over appeals from "[a]ny other judgment or interlocutory order as determined by court rule." MCL 600.308(2)(e). In addition, the Legislature gave our Supreme Court broad authority to promulgate rules that permit appeals to this Court and to determine whether those appeals would be as of right or by leave granted. See MCL 600.309. Hence, this Court's jurisdiction is generally ascertained by reference to our Supreme Court's rules.

Under the court rules, this Court has jurisdiction over appeals from a "final judgment or final order of the circuit court, or court of claims, as defined in MCR 7.202(6) . . . ." MCR 7.203(A)(1). However, the court rules also provide that, generally, a party must file its claim of appeal from a final judgment or order within 21 days of the entry of that final judgment or order. MCR 7.204(A)(1)(a). The time limit for an appeal as of right is jurisdictional. MCR 7.204(A). Hence, failure to comply with the timing requirements for an appeal as of right

deprives this Court of jurisdiction to consider the appeal as of right. Nevertheless, this Court also has jurisdiction over appeals by leave granted, which includes appeals from "any judgment or order when an appeal of right could have been taken but was not timely filed." MCR 7.203(B)(5). Although appeals by leave granted must also generally be filed within 21 days after entry of the "judgment or order," see MCR 7.205(A), the court rules specifically grant this Court discretion to grant leave with regard to untimely appeals. MCR 7.205(F)(1). But that discretion is limited: this Court may not grant leave to appeal if the untimely appeal "is filed more than 12 months" after the entry of "a final judgment or other order that could have been the subject of an appeal of right . . . ." MCR 7.205(F)(3)(a).[5] The establishment of a firm deadline prevents stale applications for leave to appeal; it forces the parties to raise claims of error while the participants still have a sound grasp of the facts and events surrounding the litigation.

### D. CLAIMS OF APPEAL FROM CONSOLIDATED CASES

The current appeal involves two consolidated cases: a case involving claims of discrimination and retaliation in the circuit court and a case involving claims based on property and contract in the Court of Claims. The claims in the case in the Court of Claims were dismissed on May 16, 2006, but the claims in the case in the circuit

---

[5] We note that, since the grant of leave to appeal in this case, our Supreme Court has amended MCR 7.205 to permit this Court to grant leave to appeal beyond this one-year limit under specified circumstances. See Administrative Order No. 2007-40, 483 Mich li (2009). However, for purposes of this appeal, we shall apply the version of MCR 7.205 in effect when this Court granted Chen's applications for leave to appeal in August 2008. See *Reitmeyer v Schultz Equip & Parts Co, Inc*, 237 Mich App 332; 602 NW2d 596 (1999).

court were not finally resolved until May 3, 2007. Because Chen did not file an appeal within 21 days of either order, Chen could not appeal as of right. Instead, Chen had to rely on this Court's discretionary ability to grant leave to appeal with regard to otherwise untimely appeals. MCR 7.205(F)(1). But Chen did not apply for leave to appeal until February 2008. Although the February 2008 application for leave to appeal was within one year of the order finally resolving Chen's circuit court claims, the application was more than 20 months after the May 2006 order dismissing his claims in the Court of Claims. Hence, we must determine whether MCR 7.205(F)(3)(a) bars this Court from granting leave to appeal those latter claims.

On appeal, Chen argues that the consolidated cases must be treated as a single case for purposes of appeal. Thus, according to Chen, the final order applicable to the appeals in this case was the order entered in May 2007. Chen relies in part on the definition of "final judgment" or "final order" provided under MCR 7.202(6). However, the definition of final judgment or order does not address situations involving consolidated cases. Instead, the rule specifically defines the final judgment or order for "a civil case"—that is, the definition of final judgment or order refers to the final judgment or order in a *single* case. See MCR 7.202(6)(a). Consequently, MCR 7.202(6)(a) cannot be understood to require consolidated cases to be treated as a single case for purposes of determining the timeliness of appeals.[6] Because the court rules dealing with appellate jurisdiction do not address this issue, we shall

---

[6] Chen also relies on an unpublished case in which this Court determined that the final judgment or order under MCR 7.202(6) for consolidated cases is the final judgment or order that disposes of all the claims for all the parties in the consolidated cases. However, for the reasons stated, we find this analysis unpersuasive. See MCR 7.215(C)(1).

examine those court rules and authorities addressing the treatment of consolidated cases.

The court rules provide trial courts with the discretion to consolidate multiple cases when the cases involve "a substantial and controlling common question of law or fact . . . ." MCR 2.505(A). However, this court rule is silent with regard to whether the consolidated cases are effectively merged into a single case. As one commentator has noted, the "term 'consolidation' is used to describe two different situations in which separate actions are 'joined' and tried together." 3 Longhofer, Michigan Court Rules Practice (5th ed), § 2505.3, p 79.

> The first situation is that in which there are two or more actions pending, normally between the same parties, and the actions are joined together to form a single action in which a single judgment is entered. The second situation is that in which several actions are ordered to be tried together but each retains its separate character and requires the entry of a separate judgment. This type of consolidation does not merge the actions, the parties in one action do not become parties to the other, and the pleadings in one action are not considered pleadings in the other. [*Id.*]

Nevertheless, although the term "consolidation" is often used to refer to both situations, Longhofer cautioned against treating MCR 2.505(A) as applying to both. Michigan Court Rules Practice, *supra*, p 80. This is because Michigan already makes elaborate provision for joinder when cases arise out of the same transaction or occurrence:

> Theoretically, if two separate actions arise out of the same transaction or occurrence and involve the same basic subject matter, MCR 2.203(A) requires that they be joined in the original action. A defendant's request that claims not so joined be "consolidated" is in reality a motion for compulsory joinder under MCR 2.203(A), to be evaluated

by the standards set forth in that rule, and is not a true motion for consolidation under MCR 2.505(A).

Conversely, if the separate actions involve claims that could have been joined under MCR 2.203(B), but which were not, MCR 2.505(A) is hardly sufficient justification to *require* merger of those actions at a later time. The actions should, appropriately, retain their individual identities. This is especially true if additional parties are present. [*Longhofer, supra,* p 80 (emphasis in original).]

Although no court has directly confronted the issue present in this appeal, the few Michigan courts to have addressed consolidation generally agree that consolidated cases should retain their separate identities.

In *People, ex rel Director of Conservation v Babcock,* 38 Mich App 336, 340; 196 NW2d 489 (1972), the Court examined whether a trial court could properly enter a single judgment for two cases that had been consolidated under the predecessor to MCR 2.505(A). See GCR 1963, 505.1. On appeal, the plaintiff argued that the trial court properly issued a single judgment; the plaintiff noted that "after consolidation the two cases were treated as one and that it can perceive no reason for entering separate judgments." *Babcock,* 38 Mich App at 342. In examining the issue, the Court in *Babcock* noted that consolidation can refer to two different situations: "First, where several actions are pending between the same parties stating claims which could have been brought in separate counts of a single claim. Second, 'where several actions are . . . tried together but each retains its separate character and requires the entry of a separate judgment'." *Id.* at 342, quoting 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), Rule 505, p 364. The Court then explained that the case before it represented the second situation and, for that reason, rejected the notion that a single judgment could be entered for consolidated cases: "a consolidation does

not merge the two cases." *Babcock*, 38 Mich App at 343. Rather, under those circumstances, "they keep their separate identities and parties in one action do not become parties to the other, and pleadings in one are not pleadings in the other." *Id.* (citations omitted). For that reason, the Court further explained that "[w]hen a decision is rendered, it is to be rendered separately in each case." *Id.* Thus, under *Babcock*, where two cases involve claims that could not have been brought as separate counts in a single complaint, but are nevertheless consolidated for administrative convenience, the consolidated cases retain their separate identities.

In another case involving the effect of consolidation, this Court noted that res judicata could apply between consolidated cases because consolidation is a matter of " 'convenience and economy in administration' " and " 'does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.' " *Bergeron v Busch*, 228 Mich App 618, 623; 579 NW2d 124 (1998), quoting *Johnson v Manhattan R Co*, 289 US 479, 496-497; 53 S Ct 721; 77 L Ed 1331 (1933), and citing, among other cases, *Babcock*, 38 Mich App at 342-343.

In the present case, the Court of Claims had exclusive jurisdiction over Chen's contract claims and the University's handling of his personal property. MCL 600.6419(1)(a). Hence, the circuit court was without jurisdiction to adjudicate those claims. For that reason, the trial court dismissed those claims without prejudice and Chen filed a separate complaint in the Court of Claims. However, Chen's case in the Court of Claims was consolidated with his case in the Wayne Circuit Court under MCL 600.6421, which provides that "[c]ases in the court of claims may be joined for trial with cases arising out of the same transaction or series of transactions which are

pending in any of the various courts of the state." Although this statute refers to the joining of cases, it does not provide for their complete merger. Rather, the joining is "for trial" and, even then, MCL 600.6421 provides that the case involving the claims in the Court of Claims must be "tried and determined by the judge even though the trial court action with which it may be joined is tried to a jury . . . ." Indeed, this Court has held that MCL 600.6421 does not permit the circuit court to exercise subject-matter jurisdiction over claims against the state. See *Lumley v Univ of Michigan Bd of Regents*, 215 Mich App 125, 133; 544 NW2d 692 (1996). Thus, the case in the circuit court must be treated as separate from that in the Court of Claims even though the same trial court presides over each. *Id.* at 134-135 (noting that the verdict in the circuit court case can be inconsistent with the verdict in the Court of Claims case when decided by separate triers of fact). As this Court explained in *Todd v Dep't of Corrections*, 232 Mich App 623; 591 NW2d 375 (1998), a trial court sitting as both a circuit court and the Court of Claims for related cases must be careful to ensure that it does not confuse its jurisdiction:

> Further, although one of the aims of MCL 600.6421; MSA 27A.6421 is to ensure the speedy and efficient resolution of cases arising out of the same transaction, a circuit court cannot assume subject-matter jurisdiction in order to promote efficiency where there is otherwise no jurisdiction. The circuit judge's authority to sit as a Court of Claims judge extended only to the Court of Claims case and, consequently, only to claims asserted against the state in the Court of Claims case. The circuit court had no subject-matter jurisdiction over a claim against the state brought in the circuit court case, and the circuit court could not assume that jurisdiction on its own. The claim for indemnification should have been brought in the Court of Claims. [*Todd*, 232 Mich App at 631-632 (citations omitted).]

Because MCL 600.6421 provides for the administrative consolidation of cases similar to the consolidation provided under MCR 2.505, see *Longworth v Dep't of State Hwys*, 110 Mich App 771, 775-776; 315 NW2d 135 (1981) (characterizing the joining of cases under MCL 600.6421 as a "consolidation" for reasons of efficiency), we conclude that the consolidation did not merge the two cases; instead, both cases retained their separate identities. *Babcock*, 38 Mich App at 343; *Todd*, 232 Mich App at 628-629. Because the cases retained their separate identities, the time for appeal must be determined by reference to the final judgment or order for the individual cases. See MCR 7.202(6)(a)(i); MCR 7.203(A)(1) and (B)(5). The trial court, sitting as the Court of Claims, entered the final order disposing of all Chen's claims in the Court of Claims in May 2006. Thus, Chen had to file his application for leave to appeal within one year of that date. Because Chen did not file his application for leave to appeal until February 2008, it was untimely and this Court did not have the discretion to grant leave to appeal.[7] MCR 7.205(F)(3)(a). Consequently, we must dismiss Chen's appeal in Docket No. 283575 for lack of jurisdiction.[8]

---

[7] Although not raised by the parties, we note that tolling would not have rendered Chen's appeal timely. See *Beavers v Barton Malow Co*, 480 Mich 1049 (2008), citing *Riza v Niagara Machine & Tool Works, Inc*, 411 Mich 915 (1981), and *People v Kincade (On Remand)*, 206 Mich App 477, 483; 522 NW2d 880 (1994).

[8] We are cognizant that in *Cipri v Bellingham Frozen Foods, Inc*, 213 Mich App 32, 40; 539 NW2d 526 (1995), it was stated that "this Court possesses jurisdiction to consider cases on leave granted even when the time requirements are not met." However, *Cipri* involved a jurisdictional challenge based on MCR 7.205(A), rather than the time limit provided by MCR 7.205(F)(3). *Cipri*, 213 Mich App at 38-40. Further, the Court's holding was premised on the fact that, although the time limit provided under MCR 7.205(A) had passed, the Court still had the authority to grant leave under MCR 7.205(F). *Cipri*, 213 Mich App at 39. Thus, understood in context, the decision in *Cipri* stands for the proposition

## III. CLAIMS IN DOCKET NO. 283420

### A. STANDARD OF REVIEW

In Docket No. 283420, Chen argues that the trial court erred when it granted summary disposition and dismissed his claims premised on national origin and age discrimination and retaliation.[9] This Court reviews de novo a trial court's decision whether to grant summary disposition. *Hamade v Sunoco, Inc (R&M)*, 271 Mich App 145, 153; 721 NW2d 233 (2006).

### B. ADVERSE EMPLOYMENT ACTION

Chen first argues that the trial court erred when it concluded that Chen had not presented evidence that he suffered an adverse employment action that can support his discrimination and retaliation claims.

In the present case, Chen alleged that the University unlawfully discriminated against him because of his national origin and age, and retaliated against him after he raised his discrimination claims with the Equal Employment Opportunity Commission. Michigan's Civil Rights Act (the CRA) provides, in relevant part,

---

that, where this Court has the discretion to grant leave to appeal and properly does so, it necessarily has jurisdiction to consider the appeal. This case is significantly different. Under MCR 7.205(F)(3), this Court had no discretion to grant Chen's application for leave to appeal. And this Court's erroneous decision to grant the application did not give it jurisdiction where it otherwise had none. See *People v Tull*, 460 Mich 857 (1999) (statement of CORRIGAN, J.) ("The language in MCR 7.205(F)(3) operates as a jurisdictional limitation on the ability of the Court of Appeals to grant leave where the application is filed more than twelve months after entry of judgment."), but see *id.* at 859 (statement of KELLY, J.) (noting that the Supreme Court has on at least one occasion waived the strict time limit and ordered the Court of Appeals to consider an untimely appeal where the unique equities warranted it).

[9] Chen has not appealed the dismissal of his claims premised on the Freedom of Information Act or discrimination based on disability.

that an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . national origin [or] age . . . ." MCL 37.2202(1). The CRA also prohibits employers from retaliating against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MCL 37.2701(a). In order to establish a claim under both MCL 37.2202 and MCL 37.2701, the plaintiff must establish that he or she suffered an adverse employment action. See *Lytle v Malady (On Rehearing)*, 458 Mich 153, 172-173; 579 NW2d 906 (1998) (opinion by WEAVER, J.); *Garg v Macomb Co Community Mental Health Services*, 472 Mich 263, 273; 696 NW2d 646 (2005), amended 473 Mich 1205 (2005).

There is no exhaustive list of what constitutes adverse employment actions. *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 312; 660 NW2d 351 (2003). And what might constitute an adverse employment action in one employment context might not be actionable in another employment context. See *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 363; 597 NW2d 250 (1999). Hence, whether Chen suffered an adverse employment action must be ascertained in light of the unique characteristics of his status as a tenured professor at a major state university. Nevertheless, regardless of the employment context, in order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. *Meyer v Center Line*, 242 Mich App 560, 569; 619 NW2d 182 (2000). In addition, there must be an objective basis for demonstrating that the employment

action is adverse because a plaintiff's subjective impressions are not controlling. *Wilcoxon*, 235 Mich App at 364. Materially adverse employment actions are akin to " ' "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." ' " *Id.* at 363, quoting *Kocsis v Multi-Care Mgt, Inc*, 97 F3d 876, 886 (CA 6, 1996), quoting *Crady v Liberty Nat'l Bank & Trust Co*, 993 F2d 132, 136 (CA 7, 1993).

### 1. ASSIGNMENT OF A LAB

Chen first argues that the failure to "restore" his laboratory constituted an adverse employment action capable of supporting his discrimination claims.

As a preliminary matter, we agree that changes in access to a lab can constitute an adverse employment action under some circumstances. See, e.g., *Chuang v Univ of California Davis Bd of Trustees*, 225 F3d 1115, 1125-1126 (CA 9, 2000) (noting that evidence that the forcible relocation of the plaintiffs' lab disrupted ongoing research, damaged equipment, caused the loss of samples, resulted in the loss and withholding of research grants, and caused staff to quit was sufficient to establish a question of fact regarding whether the relocation constituted an adverse employment action). Testimony established that the inability to access a lab might affect a professor's ability to engage in certain types of research, obtain extramural funding, direct graduate students, and publish peer-reviewed articles. Nevertheless, not every professor needs a lab in order to materially contribute to his or her department. Testimony established that, even without a lab, a professor can

teach graduate and undergraduate classes, publish texts or other course materials, and participate in a variety of other departmental activities. Likewise, testimony established that the individual needs of a professor will vary over time depending on whether the professor is actively engaging in research and on the nature of the research. Hence, not every professor will need a lab in order to successfully pursue his or her employment. For that reason, an employer's decision to take away a lab or refuse to assign a lab may or may not constitute an adverse employment action depending on the facts peculiar to the professor's employment needs.

Here, Chen does not dispute that he had a lab from 1980 to 1988. Despite this, Chen apparently did not use the lab to conduct research, obtain grants, or supervise graduate students. In 1988, Gangwere assigned Chen a new lab, but Chen refused to use it because he claimed it was too small and had a fan that purportedly made the room unsuitable. In 1991, Smith assigned Chen yet another lab. However, Chen again refused to use it because it was ostensibly radioactive.[10] Thus, by the time Lilien assumed the department's chairmanship in 1994, Chen had not been actively using a lab to do research, obtain grants, or supervise graduate students for more than 10 years.[11] During these years, Chen's employment duties had largely been confined to teach-

---

[10] There is no record evidence that this lab was ever reassigned to a different professor. Hence, it is possible that this lab is still assigned to Chen. Nevertheless, because the University does not argue that Chen currently has a lab, we will proceed on the assumption that he does not have access to a lab.

[11] Because the prior assignments occurred more than three years before Chen filed his compliant, even if those assignments constituted adverse employment actions, they would not be actionable. See *Garg*, 472 Mich at 284-285.

ing. Further, although Chen presented evidence that he informed Lilien that he wanted to have access to a lab in order to do research and to supervise a graduate student, he did not present evidence that he had developed a research proposal that required a lab and he no longer met the requirements for supervising a graduate student. And Chen's subjective belief that access to a lab was essential was, by itself, insufficient to establish a question of fact regarding whether he actually needed a lab in order to perform his duties. *Wilcoxon*, 235 Mich App at 364; see also *Green v Maricopa Co Community College School Dist*, 265 F Supp 2d 1110, 1120-1122 (D Ariz, 2003) (noting that the plaintiff failed to meet her burden of proving that the defendant's interference with facilities important to her job performance rose to the level of an adverse employment action). Consequently, under the facts of this case, there was no objective evidence that Lilien's alleged refusal to assign Chen a new lab constituted an adverse employment action.

### 2. THREAT TO START TENURE REVOCATION PROCEEDINGS

Chen next argues that Lilien's threat to start tenure revocation proceedings unless Chen retired also constituted an adverse employment action. In the present case, it is undisputed that Chen is still a tenured professor at the University. Indeed, it is undisputed that tenure revocation proceedings have never been formally initiated against Chen. And, even assuming that a threat of tenure revocation could under some circumstances constitute an adverse employment action, Chen failed to present any evidence that the threat of tenure revocation itself resulted in a materially adverse change in the terms or conditions of his employment. *Meyer*, 242 Mich App at 570. Hence, the threat did not rise to the level of an adverse employment action.

### 3. TEACHING DUTIES

Chen also argues that he suffered an adverse employment action when Lilien eliminated all his teaching duties. We agree that permanently removing a professor from all teaching duties might rise to the level of an adverse employment action. However, the mere alteration of job responsibilities—such as the assignment to new or different classes—does not, by itself, constitute an adverse employment action. *Id.* at 569. In this case, there is no evidence that Lilien's decision to stop assigning general undergraduate courses to Chen and to temporarily suspend Chen's graduate level courses amounted to an adverse employment action. Although Chen testified that he liked to teach general undergraduate courses because it helped to channel students into his graduate level classes, he also testified that he did not begin to teach general undergraduate courses until about 1987 or 1988. Hence, Chen apparently did not teach general undergraduate courses for the majority of his career without any adverse effect on his compensation, status, or benefits. Likewise, although Lilien suspended Chen's teaching of graduate level courses for a time, there is no evidence that the decision was intended to be permanent and Chen resumed teaching graduate level courses in less than a year. There is also no evidence that Chen's suspension from teaching graduate classes during that period adversely affected his compensation, status, or benefits. Hence, there was no evidence that these changes to Chen's teaching duties amounted to an adverse employment action. *Wilcoxon*, 235 Mich App at 364.

### 4. GRADUATE FACULTY STATUS

Chen also argues that Lilien's refusal to restore Chen's regular graduate faculty status and to permit

him to supervise a graduate student constituted adverse employment actions. However, there is no evidence that Lilien caused Chen to be demoted to associate graduate faculty status. Indeed, the evidence suggests that Chen had that status since before Lilien assumed the chairmanship. Similarly, there is no evidence that Lilien could establish an exception from the rule that only regular graduate faculty may supervise graduate students. Hence, there is no evidence that Lilien's actions or omissions with regard to Chen's graduate faculty status and desire to supervise a graduate student had any effect on Chen's employment. *Peña*, 255 Mich App at 314.

### 5. MERIT INCREASES

Chen also contends that he was "deprived [of] the tools to do research or serve on Committees," which resulted in his inability to obtain a merit increase in his pay. We agree that the failure to grant a merit increase, which is otherwise warranted, can constitute an adverse employment action. However, Chen does not identify the specific committees or dates on which he would have served had he not been deprived of his ability to serve and Chen does not specifically identify how he was deprived of the ability to serve—that is, he does not present any evidence that at some point he tried to serve on a committee and was prevented from doing so as a result of another's actions or omissions. Chen also failed to present evidence that his inability to serve on a committee directly affected his ability to obtain a merit increase in salary. Likewise, Chen does not identify the merit increase he would have otherwise received had he had the "tools to do research." Given Chen's failure to argue this issue and support it with citations of items in the record and legal authorities, we

conclude that he has abandoned this claim on appeal. See *Hamade*, 271 Mich App at 173.

### 6. MISCELLANEOUS ADVERSE ACTIONS

Finally, Chen also argues that he suffered adverse employment actions when the University lost his property, when Lilien instructed the faculty and staff not to help or talk to Chen, when Lilien humiliated Chen by discussing Chen's situation with others, by the lack of support from Lilien and previous chairpersons, and through ongoing harassment. On appeal, Chen does not state how these acts adversely affected his employment and does not cite authority to support his contention that these actions rose to the level of adverse employment actions. Therefore, we conclude that he has also abandoned his claims that these constituted adverse employment actions. *Id.*

Nevertheless, even if we were to conclude that these claims had not been abandoned, we would conclude that they did not rise to the level of adverse employment actions. Chen's subjective impression that his employment was adversely affected by the failure of various chairpersons to support him, by ongoing harassment, and by Lilien's decision to discuss Chen's situation with other faculty does not establish adverse employment actions. See *Peña*, 255 Mich App at 314. Rather, Chen had to identify objectively verifiable acts or omissions that adversely affected a term or condition of his employment. *Id.* For that reason, evidence of ostracism or isolation, by itself, does not constitute evidence that there was a change in employment conditions sufficient to constitute an adverse employment action. *Id.* at 315.

Chen also did not present any evidence that his ability to serve on the department's faculty was adversely affected by his loss of property. Indeed, he

successfully served as a professor for more than eight years without his Microwave Device and apparently worked for approximately a year before he realized that his personal property from Room 309 was missing. Likewise, after he discovered that his personal property was missing, he continued to teach and continued to earn the same compensation and benefits. Consequently, although Chen now clearly desires his property, there is no evidence that the loss of personal property affected the conditions of his employment in such a manner that it constituted an adverse employment action. See *Wilcoxon*, 235 Mich App at 363.

When faced with the University's motion for summary disposition, Chen failed to establish that he suffered an adverse employment action, which was an essential element of Chen's claims premised on discrimination and retaliation. *Lytle*, 458 Mich at 172-173; *Garg*, 472 Mich at 273. Consequently, the trial court did not err when it granted summary disposition of Chen's claims premised on national origin discrimination, age discrimination, and retaliation. MCR 2.116(C)(10).

### IV. CONCLUSION

Because this Court did not have jurisdiction to grant leave to appeal in Docket No. 283575, we dismiss that appeal with prejudice. In Docket No. 283420, we conclude that there were no errors warranting relief. For that reason we affirm in Docket No. 283420. Because the University is the prevailing party, it may tax costs under MCR 7.219.