# STATE OF MICHIGAN

# COURT OF APPEALS

MICHELLE CHOJNOWSKI, SHARON STONE, KATHY WITTMAN, and KENNETH WROBEL[1],

Plaintiffs-Appellants,

v

HURON CLINTON METROPOLITAN AUTHORITY, GEORGE PHIFER, and LT. JOHN ORSKEY,

Defendants-Appellees.

UNPUBLISHED
March 26, 2015

No. 317655
Livingston Circuit Court
LC No. 12-026839-CZ

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and STEPHENS, JJ.

PER CURIAM.

Plaintiffs, Michelle Chojnowski, Sharon Stone and Kathy Wittman, appeal as of right orders granting summary disposition in favor of defendants, Huron Clinton Metropolitan Authority (HCMA), George Phifer and Lt. John Orskey. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

Plaintiffs sued defendants, alleging violations of Michigan's Elliott Larsen Civil Rights Act (CRA), MCL 37.2101 *et seq.*, and intentional infliction of emotional distress. Wittman was permitted to file an amended complaint to add a count of assault and battery. The complaint alleged that plaintiffs, who were all employees of HCMA, were targeted for harassment and discrimination after their colleague, Kelle Tyitie, filed an Equal Employment Opportunity Commission (EEOC) complaint against defendants Orskey and Phifer in May 2010. Orskey was a lieutenant and Phifer was the chief of HCMA. Tyitie, who was a college student and seasonal employee, believed that after being trained as a parks officer, she would have the opportunity to work the midnight shift. However, Orskey told her that she could not work that shift anymore

---

[1] The parties stipulated to dismiss Wrobel from the case. *Chojnowski v Huron Clinton Metropolitan Authority*, unpublished order of the Court of Appeals, entered October 28, 2014 (Docket No. 317655).

-1-

because she was a female and Phifer did not want "the girls" to work midnights. Tyitie was later allowed to work the midnight shift.

## A. CHOJNOWSKI'S CLAIMS

Chojnowski began her career at HCMA in April 2003 as a park ranger; the designation was later changed to police officer. Chojnowski testified that Phifer "hates women, because that's all he did was go on a rampage against women, there were not any male officers in any of this."

Chojnowski's claims were related to discipline she received for so-called "grooming infractions" after she failed to properly fix her tie to her collar. Phifer pulled her aside and verbally told her that she had to comply with the rules and regulations "and he told me remember, we got you here." Chojnowski was insulted by the idea that she was promoted for anything other than her own hard work. Chojnowski was then verbally counseled by Sergeant Cassity, who told her that Phifer told him to verbally counsel her about the infraction. A few days later, Chojnowski was counseled by Lieutenant Batzer, who was also told by Phifer to counsel Chojnowski on the infraction and to follow up with a memo that the counseling had occurred. Chojnowski admitted that she and Batzer also discussed other issues that had nothing to do with uniform infractions. Three months later, Chojnowski was "called out" to meet with Phifer and made to wait in the lobby for 45 minutes to an hour before speaking with him; she was being paid for her time. She had no idea what the meeting was about: "I had a million things running through my head, anxiety and stress was taking its toll[.]" During the meeting, Chojnowski and Phifer talked about a number of issues, but he immediately noted his disappointment with Chojnowski's dress code infraction. He did not yell, but Chojnowski believed she "was being called out there in fear for losing my job." Chojnowski believed that the tie clip counseling was inappropriate and harassing and subjected her to humiliation and embarrassment. There were numerous other officers that failed to wear their ties properly, yet she was "singled out." Union representative Cassity advised Chojnowski that the counseling was not a "grievable issue" to present to the union. To her knowledge, she was never formally disciplined and nothing was ever placed in her file. She filed an EEOC complaint, but they refused to pursue it.

Chojnowski also complained that Phifer called her on her personal cell phone and counseled her that she was abusing her sick days. He indicated that he had a young child and never once had to call in sick. She was on probation at the time.

Chojnowski had been taking Wellbutrin for anxiety and depression off and on for at least twelve years. She blamed a rash on "stress from Phifer."

## B. WITTMAN'S CLAIMS

Wittman testified that after Tyitie's EEOC "[a]ll females that worked on the police department were disciplined, fired, or resigned." Wittman complained that she was also singled out by Phifer:

It bothered me that the Chief of Police was singling me out. One of the first times that I had met him, if not the first time, he came up to me and said with a big

smile, Officer Wittman, I've been watching you, you know, you're pretty charismatic, and these officers follow you and listen to you.

Phifer would call her constantly and come to her asking her to do things that "a simple line officer" was generally not asked to do. It bothered Wittman both as a police officer and as a woman.

Phifer called Wittman "Floppy" for how she wore the flaps of her hat down. Wittman found that term degrading. Sergeant Wrobel told her that Phifer called her "Officer Floppy" at a meeting in front of the command structure. Wittman believed that Phifer and Orskey "were in cahoots and on a rampage to do something about my hat because they couldn't never [sic] do anything with me is what I figured. They wanted to take me out or start reprimanding me or disciplining me." She testified:

> I mean, I find it absolutely ridiculous that Chief Phifer is going to discuss my floppy hat, being that just four months – in September 20, 2010 I had surgery for a tonsillectomy. We're talking the dead of winter. He is now trying to make me believe that I alone, just special orders for me, that I have to walk in to the squad room on an afternoon shift in the middle of February or January or any winter long and put my flaps up because it's [sic] doesn't look good. To who? The office is closed. No one comes back into the police squad room standardly [sic]. I'm there by myself working the shift. If I'm not, I'm with my officer. Everyone else can wear their hat the way they want to. It doesn't matter where, whether it's in the station, out of the station, in their car, out of the car. I'm trying to protect my health and my ears and work the shift. He's giving me special orders here. This is all about intimidation, and violence, and harassment of the reason why he is there. Let's not make mistakes about this. This is absolutely absurd that my Chief of Police is coming from Pontiac all the way down – or wherever he's coming from, making it sound like, oh, that's the – stop, yeah, that I just happened to come and visit you, when all the personnel are gone. He's in his own personal car. He's in plain clothes, and we're having a conversation about my hat, and my car [he had asked her to wash her patrol car], that is unbelievable.
>
> What it is, is that he's coming down and he's letting me know I used to own you, you used to lie for me, now you're coming out and you're not lying anymore, and now you're going to get it. This meeting was about violence, and we have tried through all of these lawsuits and all these plaintiffs to tell everyone from the top on down, including human resources, and everyone is trying to keep a ceiling on this. This is more than this.

***

> It is of no consequence [sic: coincidence] that Chief Phifer came on the day that I was on that shift by myself and at a time when no one else would be there except for the little toller that's up in front. She has to stay in the toll booth. It was me and him back in that office alone, and he did not wave to me. How did he arrive at the station the same time I did. I was only in that station for a few minutes. I

-3-

came there to drop off money. I had just left the nature center. I'll never forget this whole entire thing like it was a nightmare.

***

So, as I find out later, he must have been following me around beforehand watching me.

Wittman explained that Phifer would order her to write favorable letters on his behalf. She also testified that Phifer also subjected her to an unwanted hug, which she considered "sexual violence" and later filed a criminal complaint against Phifer.

Wittman's allegations against Orskey revolved around the fact that he sent her a You Tube video titled "How Not to Get Arrested" by comedian Chris Rock and the fact that he "threw away my winter hat and badge." Wittman testified that her partner at the time, Karl Hatcher, found Wittman's hat "in the trash right at the very desk, the closest point where Orskey was sitting at, and his paycheck envelope was on top of my hat . . . so my sergeant had set me up for discipline with Phifer and probably was on the phone notifying him at this time without knowing that we had actually found that hat."

Wittman testified that she was "bleeding out psychologically." She was on family medical leave "[b]ecause of the stress, bringing up all of this, going through the case, trying to keep myself safe and from any discipline retaliation, any stalking, being hypervigilant on duty. It's just becoming too overwhelming to work under Chief Phifer without thinking I'll be next."

## C. STONE'S CLAIMS

Stone had been with HCMA on-and-off since 1991. She has been a part-time employee since 2000. She never applied for a full-time position, but did apply for a lieutenant's position in March 2011. She was never interviewed for the lieutenant's position and did not follow up as to why she was not interviewed. Stone believed that she was more qualified than Nicole Ford, who ultimately got the position. Stone had no disciplinary history, including in 2011.

Stone's schedule began to change on a continuous basis beginning in May 2010. At one point her supervisor, Officer Sprinkle, ordered her back from vacation and told her she would be fired if she did not come into work. She was scheduled to work on days that she had indicated were unavailable or told to work a different shift than what was originally posted. Stone believed that these schedule changes were the result of Tyitie's EEOC complaint "[b]ecause everything seemed to be fine up until 2010 with schedules and everything else, but once – after 2010 and this charge was filed, all hell broke loose on all the females of the department. That's my causal connection." Stone had never met Tyitie. Stone knew that Wittman had also filed an EEOC complaint. No one ever contacted Stone about the investigations and she did nothing to provide information in either case.

Stone's brother died in December 2011. He was cremated and there was no burial service, but there was a funeral home visitation, which Stone attended. Her mother wanted to hold another service on a Saturday in June 2012 and Stone's other brother planned yet another memorial the weekend after. Stone was upset because she only attended a portion of the first

memorial due to work. She was required to work a fireworks event, but the event had not been posted. Stone was aware of the policy that required part-time employees to be available for special "mandatory" work. On those occasions, no one was allowed to have the day off. Stone also acknowledged that no part-time employee could schedule more than one weekend a month off. Yet, Stone had "no idea to this day" why she was not allowed to attend her brother's memorial.

On June 23, 2010 Stone was summoned to the administration offices to meet with Phifer; neither Stone nor Sprinkle (her supervisor) had any idea why. When she arrived, Lieutenant Brown greeted her and told her to wait in the lobby, where she waited for approximately an hour. Phifer never came out of his office. Brown handed Stone a memo. Cassity, Stone's union representative, happened to be there for a meeting that day. The memo was apparently the result of a June 12, 2010 uniform infraction where Stone's hair was past her collar and she was out of her car without a hat. She said that both allegations were "lies." After talking with Phifer, Cassity told Stone that the infraction was not considered discipline and would not go in her record. She later spoke with Phifer at a Fourth of July fireworks event and he assured her it would not be in her file. Stone did not file a grievance, but "to receive this memo I was embarrassed and humiliated and to this day I'm still talked about in the department."

Stone also claimed that Phifer sexually assaulted her in spring 2010 when he subjected her to an unwanted hug. Stone never reported the incident to anyone.

## D. KLUCK'S INVESTIGATION

HCMA asked labor attorney Michael Kluck to investigate allegations raised by Sergeant Gary Cassity wherein Cassity claimed that Phifer "somehow treated [Chojnowski, Stone and Wittman] differently because they are all females." Kluck interviewed each of the women, as well as Phifer and Cassity. On May 12, 2011, Kluck submitted a memorandum following his investigation. He concluded:

> Chief George Phifer has consistently insisted on proper grooming standards for male and female HCMA Law Enforcement personnel. This Investigation has revealed no discriminatory practices by the Chief in that regard.
>
> With respect to the timing and content of discussion Chief Phifer had with Officer Chojnowski, there is no evidence such were motivated by any discriminatory intent. The delay in the Chief meeting with her was the consequence of schedule conflicts. The forty (40) minute wait at the Administrative Offices was not orchestrated by the Chief. Receptionists at the Administrative Offices were unsuccessful in reaching the Chief by phone or page to notify him Officer Chojnowski had arrived. Once the Chief learned she was in the lobby waiting, he summoned her to his office. The Chief's intent was to discuss with the Officer his expectations of her. Although the dress code issue of December 20, 2010 was included in the conversation, the Chief also discussed conference scheduling and equipment issues. The meeting was not disciplinary in nature.

The allegations by Sgt. Cassity that Chief Phifer engaged in improper conduct toward Officer Stone on June 23, 2010, are completely unfounded. He did not meet with Officer Stone on that date. The conduct attributed to Chief Phifer, i.e., the delay in meeting with her at the Administrative Offices, was the conduct of Lt. Jeff Brown who on that date provided her with a counseling memorandum on grooming standards.

Officer Kathy Wittman was not discriminated against on the basis of her gender when Chief Phifer met with her at Lake Erie on February 19, 2011. Chief Phifer did not know she was the on-duty officer when he made an unannounced visit to the Lake Erie office. The Chief was returning from an Ohio shopping trip with his wife and took the opportunity to visit Lake Erie as it was on his route home. No statement he made or physical action had any sexual overtones. The Chief discussed operational concerns with Officer Wittman.

None of the three (3) officers, Chojnowski, Stone or Wittman ever advised Gary Cassity they felt they were discriminated against by Chief Phifer on the basis of their gender.

## II. PROCEDURAL HISTORY

### A. MOTION TO SEVER

Defendants filed a motion to sever the Chojnowski case for purposes of trial, arguing that her claims were completely separate and unrelated to the other plaintiffs' claims. The Harvey Kruse law firm represented defendants in the suit in connection with plaintiffs Chojnowski and Wittman, while Miller, Canfield, Paddock & Stone represented defendants in connection with claims made by Wrobel and Stone. Miller Canfield filed a concurrence on the motion to sever. Chojnowski opposed the motion to sever, arguing that all of the plaintiffs' claims were inescapably related. She argued that Phifer sought to punish all female employees after Michelle Tyitie filed her EEOC complaint. Each of the instances of conduct, therefore, were relevant for plaintiffs' retaliation claims.

At a hearing on the motion, plaintiff's counsel argued that there was no potential for confusion. The trial court disagreed and granted the motion to sever, noting that there was the danger of "dragging meritless" cases along with cases that had merit. The trial court added that "[i]t may take a little bit more time but it'll be clear to the jury and also help you gentlemen with framing the issues and settling the cases."

The trial court entered an order requiring the clerk of the court to assign new case numbers to Wrobel, Stone, and Wittman.

### B. MOTIONS FOR SUMMARY DISPOSITION

Miller Canfield filed a motion for summary disposition on Wrobel's claims and Stone's claims. Defendants argued that Stone did not suffer an adverse employment action and was not treated differently from other male employees. Stone was only counseled, not disciplined, regarding grooming standards. Additionally, although Stone complained that she was not

promoted in retaliation for her participation in Kluck's interview, the internal investigation came after she was passed up for the promotion.

Harvey Kruse filed a motion for summary disposition as to Chojnowski's claim. Defendants argued that Phifer's actions toward Chojnowski were not sexual. There was simply no evidence that Phifer counseled Chojnowski about her uniform infraction because she was a woman. Moreover, the evidence demonstrated that Phifer twice promoted Chojnowski and the "single actor doctrine" prevented an inference of discriminatory animus. Most importantly, Chojnowski failed to demonstrate that she suffered an adverse employment action.

Harvey Kruse also filed a motion for summary disposition as to Wittman's claims. Defendants argued that Wittman claimed that she was sexually harassed because of one innocuous hug, but she never complained to human resources about the incident and only later brought it up to bolster her claim. There were no sexual overtures. Wittman also claims that she was retaliated against, but there were only isolated, innocent incidents, such as the Chris Rock video, her lost hat, and the fact that she was referred to as "Officer Floppy." Her claims were undermined by the numerous statements of support she made for Phifer. These alleged instances of harassment pre-dated Tyitie's EEOC complaint and, therefore, could not have been the result of retaliation.

The trial court granted defendants summary disposition as to Wrobel's claims and later granted summary disposition in defendants' favor on the remaining plaintiffs' claims. Plaintiffs now appeal as of right.

## III. ANALYSIS

## A. MOTION TO SEVER

Plaintiffs argue that the trial court abused its discretion when it granted defendants' motion to sever where the common thread for all plaintiffs was the alleged retaliation after Tyitie filed her EEOC claim against Phifer in May 2010. We disagree.

"Although we review for abuse of discretion a circuit court's grant of a motion to sever, the decision to sever trials should be ordered only upon the most persuasive showing that the convenience of all parties and the court requires it." *LeGendre v Monroe Co,* 234 Mich App 708, 719; 600 NW2d 78, 84 (1999). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Barnett v Hidalgo,* 478 Mich 151, 158; 732 NW2d 472 (2007).

The issue appears to be moot. "As a general rule, an appellate court will not decide moot issues. A case is moot when it presents only abstract questions of law that do not rest upon existing facts or rights. An issue is deemed moot when an event occurs that renders it impossible for a reviewing court to grant relief." *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117, 119 (1998) (internal citations omitted). This issue is moot for two reasons: 1) the trial court subsequently vacated its order to sever; and 2) the trial court ultimately granted defendants summary disposition. For the reasons that will be discussed later, summary disposition was proper and there are no triable issues remaining.

Even if the matter was not moot, the trial court did not abuse its discretion in granting the motion to sever.

"For convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, the court may order a separate trial of one or more claims, cross-claims, counterclaims, third-party claims, or issues." MCR 2.505.

As previously stated, the Harvey Kruse law firm represented defendants in the suit in connection with plaintiffs Chojnowski and Wittman, while Miller, Canfield, Paddock & Stone represented defendants in connection with claims made by Wrobel and Stone. Harvey Kruse filed a motion to sever Chojnowski's case and Miller Canfield filed a concurrence. Chojnowski opposed the motion to sever, arguing that all of the plaintiffs' claims were inescapably related. She argued that Phifer sought to punish all female employees after Tyitie filed her EEOC complaint. Each of the instances of conduct, she argued, were relevant for plaintiffs' retaliation claims.

A hearing on the motion was held on June 27, 2013. Plaintiff's counsel argued that there was no potential for confusion. The trial court disagreed. In granting the motion to sever, the trial court noted:

> As can be noted from my original comments to the lawyers about who was representing who and what, this case is gonna be fought with some – some confusion to a jury I can see that already. I think from what – from what I'm able to glean, these cases are all unrelated in my view. And it would seem to be confusing, as well as uneconomical and prejudicial to hear de mono one case. What I'm most concern [sic] with is if one case has merit it might have the affect of dragging along meritless cases. And furthermore, with all the plethora of evidence that may be unrelated evidence it might prove difficult for a jury to sit through in one – in one sitting. That being the case – and I'll tell you from the beginning I was puzzled why these all got filed together without any motion to put 'em together. So – but I let 'em go until somebody brought a motion to straighten it out. And now that a motion to sever has been brought forth on the Chojnowski matter, the Court does grant the motion to sever the Chojnowski claims pursuant to MCR 2.207 and MCR 2.505(B).

Plaintiff's counsel noted that the only motion before the court was to sever the Chojnowski case, but, after reviewing the court file, the trial court concluded that the concurrence requested severance of *all* plaintiffs and the matter was properly preaciped and noticed.

Again, plaintiff's counsel argued:

> The genesis of all four lawsuits is what happened in May and June of 2010 that we alleged under Section 701 of the Elliot Larson Civil Rights Act being MCL 37.2701. That immediately upon Kelly Tyte [sic] filing a – or giving notice that she was filing an EEO[C] complaint and notified her supervisor, Corporal Dolan, who in fact notified the chain of – the superiors above him on the chain of command, that Mr. Pfieffer [sic] began retaliating against all of the named

plaintiffs – plaintiffs in the matter outlined in the complaint. We believe that for the purpose of economy that the Court should not have to try the same facts four times. And that the issues before the Court have a common thread that being Section 701 retaliation. It was after that point in time, which is May 29th and 31st of 2010, that Pfieffer [sic] went on his rampage and eventually either fired, made working conditions so intolerable, or retaliated against each one of the plaintiffs.

The trial court reiterated:

I am separating because I believe that it's in the best interest of justice for the – for the remarks that I made on the Michelle Chojnowski file about not confusing witnesses, not having evidence come in that doesn't belong in certain cases, and not having a [non]meritorious case drag along with the case that has merit. It may take a little bit more time but it'll be clear to the jury and also help you gentlemen with framing the issues and settling the cases.

The case at bar is similar to the *LeGendre* case. In *LeGendre*, two plaintiffs brought sex discrimination claims against the defendants – the county and its prosecuting attorney, Edward Swinkey. The county concurred with Swinkey's motion to sever the cases. The trial court severed the cases for purposes of discovery and trial. *LeGendre,* 234 Mich App at 713. In rejecting the plaintiffs' claim that the trial court erred in severing the matter, this Court noted:

We conclude that different proofs would, to a great extent, be required to establish each case. Plaintiff and Feick had different backgrounds, experience levels, and longevity with the prosecutor's office, and each applied for different positions after not being reappointed by Swinkey. Further, Feick alleged age discrimination, while plaintiff did not. Moreover, holding separate trials would not foreclose the possibility of presenting evidence at plaintiff's trial of defendant's alleged discriminatory treatment of Feick, if appropriate. We conclude that under these circumstances the potential for jury confusion and prejudice against defendants was great and that the circuit court thus did not abuse its discretion when it granted defendants' motion to sever. [*LeGendre,* 234 Mich App at 720-21.]

Similarly here, the various plaintiffs all had a different set of proofs and would have the opportunity to present evidence of their colleagues' claims. In addition, the potential for confusion was great. Even the trial court became confused and granted summary disposition on claims that were never raised by Chojnowski and Stone, as will be discussed below. There is simply no reason to disturb the trial court's decision to sever, which was not an abuse of discretion.

B. SUMMARY DISPOSITION

1. STANDARD OF REVIEW

"A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the

parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817, 823 (1999).

## 2. SEX DISCRIMINATION/SEXUAL HARASSMENT/RETALIATION CLAIMS

All three plaintiffs allege that they were the victims of gender discrimination and retaliation.

MCL 37.2202 prohibits sex discrimination and provides that an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Accordingly, "it is unlawful for employers to discriminate against an individual with respect to a condition of employment because of sex." *Haynie v State*, 468 Mich 302, 307; 664 NW2d 129, 132 (2003).

In addition to prohibiting gender-based discrimination, the CRA also prohibits retaliation against employees who seek to enforce the CRA. MCL 37.2701 specifically provides:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

"To establish a prima facie case of unlawful retaliation under the Civil Rights Act, a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436; 566 NW2d 661, 663 (1997).

But first, "in order to establish a claim under both MCL 37.2202 and MCL 37. 2701, the plaintiff must establish that he or she suffered an adverse employment action." *Chen v Wayne State Univ*, 284 Mich App 172, 201; 771 NW2d 820, 839 (2009).

[I]n order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. In addition, there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling. Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. [*Id.* at 201-202 (internal quotation marks and citations omitted.]

Therefore, a plaintiff must come forward with more than just her subjective belief that she has suffered an adverse employment action; instead, an adverse employment action must be shown with "objectively verifiable acts or omissions." *Id.* at 207. "Where the harassment is sufficiently severe," harassment may alter the conditions of employment, resulting in an adverse employment action. *Meyer v City of Ctr Line*, 242 Mich App 560, 571; 619 NW2d 182, 189 (2000).

### i. CHOJNOWSKI'S CLAIMS

In dismissing Chojnowski's claims, the trial court noted:

> In this case the plaintiff has asserted two counts; Count I is sex discrimination, which arguably includes gender discrimination and sexual harassment; and Count II intentional infliction or [sic] emotional distress. However, regardless of the fact that only two counts were pled in relation to plaintiff Chojnowski's, the plaintiff attempts to argue that the incorporation by reference paragraph also incorporates Wrobel and Whitman's [sic] causes of action, which in turn allow a plaintiff to a plea of retaliation.

> Did you dismiss that retaliation or are you still claiming that?

> MR. AKHTAR: Section 701.

> THE COURT: Retaliation claim?

> MR. AKHTAR: Yes.

> THE COURT: All right. You're still claiming that?

> MR. AKHTAR: Yes.

> ***

> THE COURT: . . . Regardless of the fact that there were only two counts were pled in relation to plaintiff Chojnowski's, the plaintiff attempts to argue that the incorporation by reference paragraph also incorporates Wrobel and Whitman's [sic] cause of action, which in turn allows the plaintiff to plead retaliation. . . . [T]his type of argument runs counter to Michigan's notice pleading requirements and court rules. Specifically the primary function of pleading in Michigan is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position. . . . Furthermore, a complaint must contain specific allegations necessary to reasonably inform the adverse party of the nature of the claims the adverse party is called on to defend. . . . And each statement of a claim for relief founded on . . . a single transaction or occurrence, or on separate transactions, or occurrences must be stated in separately numbered count[s]. . . .Keeping those principles in mind, it is inappropriate to claim that a count that specifically names another plaintiff and deals with another plaintiff by name can somehow be melted into a cause of action for plaintiff Chojnowski simply due to the fact that Chojnowski

-11-

used the standard incorporation by reference paragraph. Moreover, even to the extent that plaintiff could be said to have pled a retaliation claim, there is no genuine issue of material fact as to either complete absence of the undertaking of a protected activity or adverse employment action. And consequently regardless of the pleading deficiencies the Court dismisses any alleged claim pursuant to MCR 2.116(I)(1).

Next, as to plaintiff [Chojnowski's] claim for gender discrimination. It is clear that the plaintiff has failed to provide any direct evidence. And as a result, the plaintiff is required to rely on indirect evidence in a MacDonald [sic] Douglas presumption shifting approach. However, reviewing the documentary evidence in this case it is clear that plaintiff cannot establish a materially adverse employment action or that the action was taken under circumstances giving rise to an inference of unlawful discrimination. Specifically the uniform code related counseling present in this case does not . . . equate to a disciplinary action but rather a matter of inconvenience as mentioned – or reference at least in the papers. In determining the existence of an adverse employment action courts must keep in mind the fact that work places are rarely idyllic retreats. And the mere fact that [an] employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action. . . .

Next, in addition to arguing repeated uniform counseling constitutes gender discrimination claim. The plaintiff also argues that it serves as a basis for her alleged sexual harassment discrimination. . . . In this case, however, there's absolutely no alleged sexual contact or communication. Instead . . . the plaintiff was observed admittedly out of uniform and she was counseled on four different occasions. Although this might have been annoying, it does not equate to sexual harassment and a hostile work environment.

On appeal, Chojnowski first complains that the trial court erred in finding that she failed to state a claim for retaliation. However, the issue warrants little discussion, as the trial court specifically went on to conclude that *even if she had alleged a claim of retaliation* such a claim could not survive summary disposition.

Chojnowski failed to set forth evidence of sex discrimination because she failed to suffer an adverse employment action. Chojnowski writes that "[a]t first reading, it would appear that a minor discipline for a uniform violation even though it may have taken place on (5) different occasions, would not qualify as an adverse employment action . . ." She nevertheless argues that, when viewed under the totality of the circumstances, defendants' conduct was so unreasonable that she suffered severe anxiety. However, it bears repeating that an adverse employment action must be "materially adverse to the employee—that is, it must be more than a mere inconvenience" and "there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling." *Chen*, 284 Mich App at 201-202. Chojnowski admits that she was never formally disciplined. She did not get demoted, lose pay, or suffer any other "material loss of benefits."

Chojnowski's retaliation claim also fails. Again, as just discussed, Chojnowski suffered no adverse employment action. Moreover, Chojnowski did not undertake a protected activity. She did not file an EEOC complaint nor did she file a grievance with her union. Defendants could not have retaliated against her for action that she never pursued. Nevertheless, Chojnowski argues that she was within the "zone of interest" as discussed by the United States Supreme Court in *Thompson v North American Stainless, LP,* 562 US 170; 131 S Ct 863; 178 L Ed 2d 694 (2011), and that she and her colleagues (both male and female) were effectively punished for Tyitie's EEOC complaint.

In *Thompson*, the plaintiff and his fiancée worked at the defendant company. The fiancée filed an EEOC complaint against the defendant and the defendant fired the plaintiff shortly thereafter. The plaintiff filed a retaliation claim. *Id.* at 867. At issue in that case was whether the plaintiff, who neither filed an EEOC complaint nor assisted his fiancée in doing so, had the ability to bring a retaliation claim. The Court concluded that the plaintiff could bring a claim under § 2000e-3(a) of Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq.*, because the provision applied to a broad range of conduct and was not limited to discriminatory acts affecting employment. It concluded:

> [Plaintiff] falls within the zone of interests protected by Title VII. [Plaintiff] was an employee of NAS, and the purpose of Title VII is to protect employees from their employers' unlawful actions. Moreover, accepting the facts as alleged, [plaintiff] is not an accidental victim of the retaliation—collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's intended means of harming [the fiancée]. Hurting him was the unlawful act by which the employer punished her. In those circumstances, we think [plaintiff] well within the zone of interests sought to be protected by Title VII. He is a person aggrieved with standing to sue. [*Id.* at 870.]

*Thompson* is readily distinguishable from the case at bar. Under *Thompson*, Chojnowski would have to show that defendants acted against her in order to punish Tyitie. She offers no argument that she was so "closely related to or associated with the person exercising his or her statutory rights, that it would discourage or prevent [Tyitie] from pursuing those rights." See *Id.* at 871 (Ginsburg, J. concurring) quoting EEOC Compliance Manual. In fact, while "a close family member will almost always" qualify as a relationship in which a worker would be dissuaded from engaging in a protected activity, "inflicting a milder reprisal on a mere acquaintance will almost never do so." *Id.* at 868. The only individual who undertook a protected activity was Tyitie. There is no evidence that defendants "disciplined" Chojnowski in retaliation of Tyitie's EEOC complaint in order *to punish Tyitie*. The Supreme Court discussed "zone of interest" in the context of standing, which was not at issue in this case. *Id.* at 870. Moreover, the *Thompson* Court analyzed the much broader federal statute. Michigan's CRA prohibits retaliation "because the person has opposed a violation of *this act*, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing *under this act*."

There is nothing to support Chojnowski's claim that the trial court was predisposed against her, which she claims is evident from the fact that the trial court dismissed her non-existent sexual harassment claim. As is evidenced by the record, the trial court undertook a

thoughtful and careful approach to this case, which included four plaintiffs and numerous claims. Some of those claims were in common and some were separate. As previously discussed, this type of confusion was what the trial court hoped to combat by ordering that the cases be severed. The trial court was clearly trying to cover all possible contingencies. Chojnowski cannot complain that the trial court was overly thorough.

## ii. STONE'S CLAIMS

Similar to Chojnowski's claims, the trial court granted defendants summary disposition on Stone's claims, noting:

> At the outset the Court will note that although Stone has only stated two counts in her complaint in the current motion, Stone has seemingly argued claims of sexual harassment, hostile work environment; number two, gender discrimination; three, failure to promote; and four, retaliation. However regardless of the make-up of the complaint, the Court finds that none of the currently argued claims possess the necessary factual support to survive a motion for summary disposition under C(10).

> \*\*\*

> In this case the alleged sexual conduct is a single hug. In light of the fact that this [is] only a single instance the question becomes whether the incident was severe enough to rise to the level of a hostile work environment. . . .[and, although there are times when one time could be enough] the plaintiff simply has not presented evidence of pervasive conduct to support a hostile work environment claim.

> Second, as to any alleged gender or sex discrimination claim . . . it is clear that the plaintiff cannot show that she suffered an adverse employment action. In determining the existence of an adverse employment action courts must keep in mind the fact that workplaces are rarely idyllic retreats. And the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action. . . . Specifically while there is no exhaustive list of what constitutes an adverse employment action, the fact that the plaintiff might have perceived the employment action to be adverse is not sufficient. The plaintiff must demonstrate that the employment action was objectively adverse. . . . Here the Court cannot find that the single verbal counseling on the grooming code and the alleged schedule changes to be objectively or materially adverse as the plaintiff has been subject to no disciplinary action and has not presented evidence that other part-time officers were not subjected to the same schedule changes.

> Third, as to any failure to promote claim is indisputable that, one, the plaintiff was not qualified based on Dr. McGinn's scoring following the completion of a supplemental questionnaire. And two, the position was given to another individual within the same class as the plaintiff. . . .

-14-

Lastly in relation to the hiring process. The plaintiff claims that she was retaliated against due to the fact that she was a female or because she participated in a sexual harassment investigation initiated by the defendant to investigate the plaintiff's alleged claims. First, however, the investigation cannot serve as a basis for the retaliation claim not only because the plaintiff concedes that it doesn't provide the basis, but also because the investigation occurred after the plaintiff was given a rejection letter for the lieutenant position. Second, despite the plaintiff's claims simply bein' a female doesn't provide a basis for retaliation claim. In particular, the plaintiff has to undertake a protected activity. Here Stone never undertook a protected activity prior to applying for the lieutenant position and consequently Stone not receiving the job cannot be in retaliation for anything.

Stone's claims are also unavailing. In Issue II of her brief, Stone claims that the trial court "committed reversible error when it granted defendants' Motion for Summary Disposition on plaintiffs' [sic] claim [of] sexual harassment/ hostile work environment", but she later chastises the trial court for dismissing Stone's sexual harassment claim "when plaintiff never pleaded such a cause of action of sexual harassment." Although Stone admits that she never brought a sexual harassment claim, she basically argues "quid pro quo" harassment, alleging that she was passed over for promotion because she rejected Phifer's sexual advances in the spring of 2010.[2] But, confusingly, Stone clings to retaliation as the basis for her failure to promote claim – "Plaintiff's principle cause of action under this failure to promote claim is based upon Section 701 of the Act, MCL 37.2701 [retaliation], and not under Section 102 and 103 of the Act (MCL 37.2102, 2103) [gender discrimination and sexual harassment, respectively]." Therefore, as near as we can gather, Stone complains of gender discrimination and retaliation as demonstrated by: 1) the uniform infraction; 2) the changes to her schedule; and 3) her failure to be promoted. She claims that the retaliation was the result of her fending off Phifer's sexual advances, Tyitie's EEOC complaint, and Stone's participation in Kluck's investigation. She does not make a sexual harassment claim.

Stone cannot show that she suffered an adverse employment action for purposes of gender discrimination or retaliation. In receiving counseling for her alleged uniform infraction, Stone did not suffer an adverse employment action. Like Chojnowski, Stone concedes that minor counseling over the alleged uniform infraction would not qualify as an adverse employment action were it not for the "totality of the circumstances." Additionally, although Stone complained bitterly regarding the changes in her schedule, she continuously used the word "we," meaning all part-time employees were subject to the same uncertainty week after week. Moreover, even if the changes pertained to Stone alone, it bears repeating that an adverse employment action must be "materially adverse to the employee—that is, it must be more than a

---

[2] MCL 37.2103(i)(*ii*) specifically prohibits sexual harassment where "[s]ubmission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing."

mere inconvenience" and "there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling." *Chen*, 284 Mich App at 201-202. Stone admits that she was never formally disciplined. She did not get demoted, lose pay, or suffer any other "material loss of benefits."

Stone's retaliation claim fails for the same reason as Chojnowski's. Stone suffered no adverse employment action. Moreover, Stone did not undertake a protected activity. She did not file an EEOC complaint nor did she file a grievance with her union. Defendants could not have retaliated against her for action that she never pursued. Her reliance on *Thompson* is misplaced.

As for the failure to promote, Stone was required to show that "(1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Hazle v Ford Motor Co*, 464 Mich 456, 463; 628 NW2d 515, 521 (2001). Stone's failure to promote claim is problematic for a number of reasons.

Stone applied for the lieutenant's position in January 2011. At the time, the posting was limited to only internal candidates. No one who applied for the position internally – both male and female – received an interview and the position was reposted in March 2011; this time it was open to both internal and external candidates. *Stone never applied* for the second posting because she believed that she did not meet the newly-established minimum qualifications. Stone cannot bring a failure to promote claim when she never applied for the promotion. Nor can Stone demonstrate that she was qualified for the position. When she originally applied, Stone scored only 16 out of a possible 60 points on one portion of the examination. Moreover, the individual who was ultimately hired was a female, negating any inference of discrimination.

Even assuming that Stone was qualified for the position and applied for it, she failed to set forth a causal connection between the alleged failure to promote with any of her three retaliation theories. As previously discussed, Stone cannot rely on a "zone of interest" as it pertains to Tyitie's EEOC complaint. Nor can Stone claim that her participation in Kluck's investigation was used against her when the decision about extending the lieutenant position to both internal and external candidates pre-dated her April 2011 interview with Kluck. Finally, Stone cannot claim that the "hug" incident wherein she allegedly rebuffed Phifer's sexual advances was used against her. The hug took place almost a year prior to her application for lieutenant.

### iii. WITTMAN'S CLAIMS

In granting defendants summary disposition on Wittman's claims, the trial court noted:

> [A]s to Whitman's [sic] claim of sexual harassment. Regardless of whether the conduct complained of could be considered to be sexual in nature, a review of the testimony and documentary evidence indicates that the conduct was . . . not severe or persuasive [sic] enough to create an objectively hostile or abusive work environment. That is the evidence presented does not present an environment that a reasonable person would find hostile or abusive. And accordingly the claimed conduct cannot be sexual harassment discrimination. I

point out that I believe this was a one – one hug that was never repeated and short duration. And circumstances surrounding it may have not been the type that would be of a sexual nature whatsoever from what I can gather.

Second, as to Whitman's [sic] retaliation claim. Many of the alleged incidents appear to have occurred prior to her taking part in any sort of protected activity. And further, even disregarding this fact the plaintiff has failed to create a genuine issue of material fact as to an adverse employment action. Specifically Whitman [sic] has produced no evidence of discipline or demotion. And although a party may be able to show an adverse employment action based on facts established that a job was objectively [un]bearable or even undesirable . . . there is no objective evidence that Whitman's [sic] job was unbearable. Instead the evidence reveals that her feelings are subjective, which simply cannot provide the basis for [a] retaliation claim.

Unlike Stone and Chojnowski, Wittman specifically alleges that she was sexually harassed. She testified:

I go out [of the room]. Phifer goes out at the same time. We're in the hallway. I am going out the back door. There is no lights [sic] in the hallway. It's starting to get dark. The only light that is coming is from the superintendent's room. In the window there's a long – I mean, in the door there's a long window and it's gleaming the light down the hallway. There's the exit light hallway to go out, but right there just before I exit the door Phifer says – he speaks. So, quite naturally in my rush to go out I stop, the chief is speaking. I turn around and I look at him, and he has his arms outstretched, what, no hug. It wasn't like what, no hug, or come here partner, like he says on the CD [during Kluck's investigation], like we're buddies, like we're friends. He is demanding.

\*\*\*

I looked back at him. He's doing that. I have to make the decision whether I'm going out the door. I had just heard for a half an hour how you're not listening to me. So, I either have to go out the door and either get written up, fired, whatever, for not following his official order demanding that I walk back to him or that he hugged me or whatever he's going to do. I am totally the last degradation of a woman. My husband doesn't even tell me you get over here and do me. That was disgusting. He was breaking me. He – I can't reach you any other way, I told you, and told you, and now you will come over to me.

BY MR. BURMEISTER [defense counsel]:

Q. Those are the words he used? I thought you just said he said, what, no hug?

A. Yes, but it's not like that. It's like –

Q. But you inferred all these things?

-17-

*A.* No, this is him yelling, telling me your ass better get over here and hug me.

*Q.* He raised his voice and he said that? He said you better get your ass over here and hug me?

*A.* No.

*Q.* Okay.

*A.* He put his arms outstretched, walked towards me. I walked towards him because I decided I am either going to be fired or I don't know what. I can't just walk out the back door.

*Q.* Okay.

*A.* He is telling me get over here.

*Q.* Okay.

*A.* So, he puts his arms around me and I am like going in slow motion like I am a ghost to this, because I'm like, Jesus, God, I can't believe this is a condition. If my mother could see me, if my husband could see me, I have to hug the chief. I have to do these things for him, where is this going to go.

*** 

*A.* And the chief tells me I love you. I'm like I'm his girlfriend and I don't even know it. Is this where we're going with this.

*Q.* Did he say anything else other [than] those two things, what, no hug and I love it [sic]?

*A.* I pushed me away. He told me – he said, now go wash your car. It was dismissive, like get the heck out of here.

*Q.* Okay.

*A.* It was all sexual violence.

Sex discrimination includes sexual harassment. MCL 37.2103(i) specifically provides:

(i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:

-18-

(*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

(*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

(*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. [MCL 37.2103(i).]

The first two subsections are commonly referred to as "quid pro quo" sexual harassment, while the third refers to a hostile work environment. *Hamed v Wayne Co*, 490 Mich 1, 9-10; 803 NW2d 237 (2011).

> To establish a prima facie case of hostile work environment based on sexual harassment, plaintiff must show the following:
>
> (1) the employee belonged to a protected group;
>
> (2) the employee was subjected to communication or conduct on the basis of sex;
>
> (3) the employee was subjected to unwelcome sexual conduct or communication;
>
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
>
> (5) respondeat superior. [*Haynie*, 468 Mich at 307-308, quoting *Radtke v Everett*, 442 Mich 368, 382-383, 501 NW2d 155 (1993).]

Our Supreme Court has stressed that when bringing a sexual harassment claim, a plaintiff must show that the acts undertaken were sexual in nature:

> "Sexual nature" is not defined in the statute. Where a term is not defined in the statute, we will review its ordinary dictionary meaning for guidance. "Sexual" is defined, in part, as "of or pertaining to sex" or "occurring between or involving the sexes: *sexual relations*." "Nature" is defined as a "native or inherent characteristic." Utilizing these two commonly understood definitions, we conclude that actionable sexual harassment requires conduct or communication that *inherently* pertains to sex. [*Corley v Detroit Bd of Ed*, 470 Mich 274, 279; 681 NW2d 342, 345 (2004) (internal footnotes omitted).]

Thus, "[v]erbal or physical conduct or communication that is not sexual in nature is not sexual harassment." *Id.* at 280. And "conduct or communication that is gender-based, but is not sexual

in nature, does not constitute sexual harassment as that term is clearly defined in the CRA." *Haynie*, 468 Mich at 304, 312. Our Supreme Court was careful to note that it was not holding that all hostile-work-environment actions are limited to claims of a sexual nature. *Id.* at 318.

Moreover, an objective reasonableness standard, not a gender-based conscious standard, is utilized in determining whether a hostile work environment exists in order to prevent "hypersensitive plaintiffs from recovering." *Radtke.* at 388. The Supreme Court has explained:

[W]e are persuaded that an objective reasonableness standard is mandated by the plain meaning of the statute. When interpreting the Michigan Civil Rights Act, this Court must "give effect to the plain meaning of the language used." The language at issue reveals that the inquiries in a hostile work environment action inherently involve an examination of the reasonableness of the alleged perpetrator's conduct: "hostile," "intimidating," and "offensive" are terms primarily determined by objective factors.

Furthermore, a reasonableness inquiry is necessary to fulfill the purpose of the act. As noted, the purpose of the act is to combat serious demeaning and degrading conduct based on sex in the workplace, and to allow women the opportunity to fairly compete in the marketplace. The reasonableness inquiry (i.e., objectively examining the totality of the circumstances) in a hostile work environment action, is simply a method of objectively determining whether a hostile work environment existed. The alternative would be to accept all plaintiffs' subjective evaluations of conduct, thereby imposing upon employers liability for behavior that, for idiosyncratic reasons, is offensive to an employee. We believe that such a result is contrary both to the plain meaning of the statute, as well as the statute's overall purpose. To hold the contrary would delimit the act and ensure a deluge of unwarranted litigation in contradiction of the act's purpose. Instead, the Michigan Civil Rights Act mandates that an objective standard be utilized, thereby formulating external standards of conduct to which all persons may conform. [*Id.* at 386-387 (internal citations and footnotes omitted).]

It is clear that the trial court correctly understood that an objective standard, not Wittman's subjective feelings, controlled the issue. Using an objective standard, there is simply no support for Wittman's claim that the hug was sexual in nature. Moreover, even considering the "totality of the circumstances" (i.e. the other plaintiffs' claims), "a reasonable jury could not have found from a preponderance of the evidence that [Phifer's conduct was] of a type, severity, or duration to have created an objectively hostile work environment." *Quinto v Cross & Peters Co*, 451 Mich 358, 370; 547 NW2d 314, 320 (1996).

In her appellate brief, Wittman provides little to no analysis regarding her retaliation claim. But, as with Chojnowski and Stone, Wittman's claims must fail because she fails to clear the initial hurdle of showing that she suffered an adverse employment action. Moreover, there is no evidence that Wittman undertook a protected activity.

### 3. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Both Chojnowski and Wittman claimed intentional infliction of emotional distress.

> To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. The conduct complained of must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. But where reasonable individuals may differ, it is for the jury to determine if the conduct was so extreme and outrageous as to permit recovery. [*Hayley v Allstate Ins Co*, 262 Mich App 571, 577; 686 NW2d 273, 276-77 (2004) (internal quotation marks and footnotes omitted).]

In the context of considering whether a separate tort for intentional infliction of emotional distress can be brought on the basis of an insurer's handling of a claim, our Supreme Court has noted:

> Those courts which have recognized intentional infliction of emotional distress as a separate theory of recovery have generally embraced the Restatement definition of the tort:
>
>> "§ 46. Outrageous Conduct Causing Severe Emotional Distress
>>
>> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement Torts, 2d, § 46, p. 71.
>
> Four elements are identified in this definition: (1) "extreme and outrageous" conduct; (2) intent or recklessness; (3) causation; and (4) "severe emotional distress."
>
> ***
>
> An oft-quoted Restatement comment summarizes the prevailing view of what constitutes "extreme and outrageous" conduct:
>
>> "The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

-21-

intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

[*Roberts v Auto-Owners Ins Co*, 422 Mich 594, 602-603; 374 NW2d 905, 908 (1985).]

In granting defendants summary disposition on Chojnowski's intentional infliction of emotional distress claim, the trial court noted:

Lastly, plaintiff asserts that being counseled four times for a uniform infraction is equivalent to intentional infliction or [sic] emotional distress. . . . Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regard – regarded as atrocious and utterly intolerable in a civilized community. Considering this threshold it is clear to this Court that being verbally counseled for a uniform infraction more times than maybe reasonable, necessary, does not and cannot equate to conduct beyond all possible bounds of decency. Simply put in any job there will always be inconveniences and annoying occurrences. With that being said such offense[s] do not create a tort for the intentional infliction or [sic] emotional distress.

Similarly, in granting defendants summary disposition on Wittman's intentional infliction of emotional distress claim, the trial court noted:

Next as to the intentional infliction and [sic] emotional distress . . .[a] hug in combination with getting yelled at simply cannot meet the threshold showing of extreme and outrageous conduct. Liability for such a claim is found only where the conduct complained of has been so outrageous in character and so extreme a degree as to go – go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society. . . . Here the conduct complained of could not be reasonably regarded as so extreme and outrageous as to permit recovery. As the majority of it is based on the plaintiff's subjective fears and basis of which do not objectively manifest themselves.

The trial court was clearly aware of the law when it rendered its decision and properly determined that neither Chojnowski nor Wittman raised a genuine issue of material fact as to their intentional infliction of emotional distress claims. Although Chojnowski claims to have suffered terrible emotional distress, the facts giving rise to her anxiety were simply being counseled on her uniform infraction and carefully using her sick days. Wittman complains that she was hugged and referred to as "Officer Floppy." None of these claims would cause a reasonable individual to declare "outrageous!" The conduct complained of was not so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. It was for the trial court to make an initial determination as to whether the conduct could reasonably be regarded as so extreme and outrageous as to permit recovery.

## 4. ASSAULT AND BATTERY

Wittman claimed assault and battery. In granting summary disposition on this claim, the trial court noted:

> And then lastly as to the plaintiff—as to the claim plaintiff has that the February 19th "hug" constituted assault and battery. Both torts are intentional in nature with the intent element of battery being satisfied with the defendant either subjectively or intended [sic] to cause bodily contact with the plaintiff or knew with substantial certainty that such bodily contact would result from his or her conduct. Likewise, the intent and/or willfulness to create an apprehension of eminent [sic] contact coupled with the apparent present ability to accomplish that conduct in an – is an essential element of the assault. Here, however, the Court finds that there's no genuine issue of material fact as to the issue of intent as there was no direct or circumstantial evidence on which a reasonable juror could find that the Chief intended on February 19th – intended that the February 19th hug to be an offensive touching or that he intended to put plaintiff in apprehension of eminent [sic] offensive conduct. [H III, p 67.]

In *Mitchell v Daly*, 133 Mich App 414, 426-27; 350 NW2d 772 (1984), our Court looked to the tort of assault and battery:

> The Restatement of Torts provides:
>
> > "§ 21. Assault
> >
> > "(1) An actor is subject to liability to another for assault if
> >
> > "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
> >
> > "(b) the other is thereby put in such imminent apprehension.
> >
> > "§ 32. Character of Intent Necessary
> >
> > "(1) To make the actor liable for an assault, the actor must have intended to inflict a harmful or offensive contact upon the other or to have put the other in apprehension of such contact."
>
> It is our inclination to adopt the above definition from the Restatement and to hold that the intent necessary to make out a tortious assault is either an intent to commit a battery or an intent to create in the victim a reasonable fear or apprehension of an immediate battery. This is presently the rule in criminal assault. [*Mitchell,* 133 Mich App at 426-27; see also *Tinkler v Richter*, 295 Mich 396, 400; 295 NW 201 (1940).]

Again, the standard is not what the subjective beliefs of a particular plaintiff were; an objective standard controls. Wittman complains that she was made to hug Phifer out of fear for losing her job. While offensive to her this conduct did not equal "sexual violence." Even taking the evidence in a light most favorable to Wittman, there is simply no evidence that Phifer intended to commit a battery or create in Wittman a reasonable fear or apprehension of an immediate battery.

Affirmed. Defendants may tax costs. MCR 7.219.

/s/ Kirsten Frank Kelly
/s/ Cynthia Diane Stephens