*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
August 15, 2024

*In re* DELGADO-PRUETT/DELGADO-YASIN,
Minors.

No. 368036
Oakland Circuit Court
Family Division
LC No. 21-883528-NA

Before: O'BRIEN, P.J., and CAVANAGH and SHAPIRO*, JJ.

PER CURIAM.

Respondent-father appeals as of right[1] the order of adjudication exercising jurisdiction over the minor child, JDY, as to respondent-father under MCL 712A.2(b)(1) and (2).[2] We affirm.

## I. BACKGROUND

In February 2020, respondent-father acknowledged that he was the father of JDY following a paternity test in a Friend of the Court proceeding. Respondent-father and respondent-mother

---

[1] Petitioner presents a somewhat plausible argument that respondent-father's appeal as of right was not timely filed. This Court, however, has discretion to review any judgment or order as on leave granted if " 'an appeal of right could have been taken but was not timely filed.' " *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009), quoting MCR 7.203(B)(5). To any extent that respondent-father's appeal was untimely, we exercise our discretion to review the appeal as on leave granted.

[2] At the time of respondent-father's adjudication, the trial court had assumed, and continued to maintain, jurisdiction over both captioned minor children on the basis of respondent-mother's plea to petition allegations in 2021. The trial court terminated respondent-mother's parental rights to both children in January 2024, and she is not a party to this appeal.

---

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

agreed to share joint legal custody and respondent-mother was granted sole physical custody. Respondent-father was awarded reasonable supervised parenting time.

In August 2021, the trial court authorized a petition filed by the Department of Health and Human Services (DHHS) naming only respondent-mother as a respondent. ADP and JDY remained in respondent-mother's care under the supervision of the DHHS. While that case and a criminal case against respondent-mother for abusing ADP were pending, respondent-mother fled with the children to Tanzania. In October 2021, when respondent-mother and the children returned, ADP and JDY were removed from respondent-mother's custody and placed with their maternal grandparents.

The DHHS filed a supplemental petition on March 24, 2023, adding respondent-father to the case. The petition alleged that in June 2021, respondent-father reported that if he took custody of JDY, he would send the child to live in Toronto or Tanzania with his family, as his employment situation did not allow for him to care for JDY by himself. Respondent-father also allegedly reported that he was not surprised that an incident occurred between respondent-mother and ADP due to ADP's behavior and respondent-mother being overwhelmed as a single mom. The DHHS alleged that despite these concerns and the DHHS's referral of respondent-father to the Friend of the Court, respondent-father did not take any steps to gain custody of JDY. At a parenting-time visit with the DHHS in December 2021, respondent-father did not bring any diapers or snacks, and when he was advised that the visit was scheduled to last an hour, respondent-father reportedly responded, "I do not think it will take that long" and proceeded to end the visit 30 minutes early. The petition also alleged that no parenting-time visits occurred between JDY and respondent father from December 23, 2021 to June 15, 2022 due to respondent-father's refusal to schedule visits or respond to communication from the DHHS.

At a parenting-time visit on June 23, 2022, the DHHS alleged that JDY ran from a playground toward a parking lot and respondent-father did not attempt to stop JDY, so the DHHS had to intervene. The petition also alleged that at another parenting-time visit, respondent-father was late, not interested in extending his time, and reported that he was interested in taking custody of JDY to put him in a boarding school in Tanzania. The petition states that, during an interview with Children's Protection Services (CPS) on March 3, 2023, respondent-father reported that respondent-mother threw a bag at him with a laptop in it and that respondent-mother has "a lot of anger." The petition alleged that despite respondent-father's concerns, he had not taken any steps to be more involved with JDY. Finally, the petition alleged that respondent-father denied having anything to do with respondent-mother taking the children to Tanzania; respondent-father stated that ADP needed to go to boarding school because he was worried about the safety of JDY; and respondent father stated that his short parenting-time visits were due to his "busy schedule."

A bench trial on the issue of jurisdiction as to respondent-father only took place on July 17, 2023. Following testimony from four caseworkers, the foster caregiver (maternal grandmother), and both respondent-mother and respondent-father, the trial court concluded that respondent-father was untruthful, indifferent, and unwilling to care for JDY, noting that respondent-father helped respondent-mother leave the country with the children despite having knowledge of the pending case, and that respondent-father had neglected and otherwise refused to parent JDY. The trial court found that there was more than a preponderance of evidence for the court to assume jurisdiction of JDY as to respondent-father.

This appeal followed.

## II. JURISDICTION

Respondent-father argues that the trial court clearly erred by finding statutory grounds to take jurisdiction over JDY as to respondent-father because there was insufficient evidence to support a finding that either MCL 712A.2(b)(1) or (2) was satisfied. We disagree.

### A. STANDARD OF REVIEW

We review the trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact. *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020); *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). When deciding a challenge to a court's assumption of jurisdiction over a minor child, this Court must determine whether any error in the matter "was of such magnitude that, but for it, there was an insufficient basis for the . . . court to assume jurisdiction." *In re Toler*, 193 Mich App 474, 476; 484 NW2d 672 (1992).

### B. ANALYSIS

For a court to acquire jurisdiction over a minor child, the factfinder must determine by a preponderance of the evidence that the child comes within the statutory requirements of MCL 712A.2. *In re Brock*, 442 Mich 101, 108-109; 499 NW2d 752 (1993); *In re Kellogg*, 331 Mich App at 252-253. That statute provides in relevant part:

> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .
>
> * * *
>
> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. [MCL 712A.2(b)(1) and (2).]

The statute "speaks in the present tense, and, therefore, the trial court must examine the child's situation at the time the petition was filed." *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004).

Respondent-father initially uses *In re MU*, 264 Mich App at 279, to argue that the trial court erred in taking jurisdiction over JDY as to respondent-father because (1) JDY was already living with his maternal grandparents at the time the supplemental petition was filed regarding respondent-father, (2) he was not named in the original petition as he did not create the situation that brought JDY into care, and (3) he did not fail to provide proper care and custody for JDY.

Although it is true that at the time the original petition was filed in this matter respondent-mother had sole physical custody of JDY and respondent-father was not named as a respondent in the petition, respondent-father was still legally responsible for JDY. Respondent-father neglected to provide proper care for JDY and knowingly left him at risk of substantial harm while he was in the custody of respondent-mother, as alleged in the supplemental petition. The testimony of petitioner's witnesses at the adjudication trial, whom the trial court found credible, supported jurisdiction under either MCL 712A.2(b)(1) or (2).

Concerning MCL 712A.2(b)(1), the supplemental petition seeking jurisdiction in relation to respondent-father was filed due to respondent-father's failure to take any steps to gain custody of JDY despite respondent-father's knowledge of, and concerns about, respondent-mother's behavior. JDY was in respondent's mother's care after the initial petition was filed in August 2021, until he was removed when she returned from fleeing the country in October 2021. Caseworkers testified that respondent-mother had committed substantiated acts of domestic violence against ADP while JDY was present. The evidence established that respondent-father knew that JDY was at a substantial risk of physical or mental harm while in respondent-mother's care, having acknowledged that respondent-mother was mentally unstable, suicidal, and violent. Respondent-father told caseworkers, and testified at the adjudication trial, that he had concerns about respondent-mother's behavior, including that respondent-mother had been violent toward him personally on several occasions in front of the children, and that he was frightened of her. Even so, respondent-father stated that he was not concerned about JDY staying in respondent-mother's home because it was ADP who had been harmed, not JDY. JDY watching his sibling be abused by respondent-mother was obviously harmful to JDY's mental health and respondent-father's actions show that he either failed to understand this or did not care enough to take the necessary steps to gain custody of JDY.

The evidence also established that respondent-father assisted respondent-mother in unlawfully fleeing with ADP and JDY to respondent's native Tanzania, while she, along with the children, were under the trial court's jurisdiction, and while she was also serving criminal probation. Testimony regarding respondent-mother's month with the children in Tanzania also suggested that respondent-father diverted to himself money set aside for JDY's care. Respondent-mother testified that she deposited approximately $32,000 that she had received from her divorce settlement into a joint account with respondent-father, which was to be used for JDY's care in the event that she was incarcerated as the result of her criminal case. Respondent-father admitted that he transferred the money to a different account to which respondent-mother did not have access, and asserted that he used the money to help pay for respondent-mother's and the children's trip to Tanzania. Respondent-mother testified that respondent-father had arranged for a place to them to stay for approximately $500 for one month, but that she had paid for the airline tickets, food, and clothing, and did not receive any financial support from respondent-father during the one-month stay. Respondent-father testified that he had used some of the funds to obtain a Tanzanian passport

for JDY, and asserted, without any corroborating evidence, that it cost $85,000 to do so. Respondent-father additionally testified that he took out a "business loan" for funds above those that respondent-mother had deposited into the joint savings account. However, respondent-mother noted that respondent-father was unemployed around the time of the Tanzania trip, and that he "pretty frequently" asked her for money while blaming her for the loss of his job. Thus, instead of using the money respondent-mother set aside to support and care for JDY, respondent-father chose to obtain a foreign passport for JDY or divert money meant for JDY's care to cover his own personal expenses. Respondent-father also placed JDY at a substantial risk of harm by helping respondent-mother take the children to Tanzania while they were under the jurisdiction of the trial court.

In addition, testimony at the adjudication bench trial showed that respondent-father did not provide financial support for JDY during the pendency of this case. Respondent-mother testified that she was receiving approximately $200 per month in child support before JDY was removed from her care. Respondent-father reported that he was not currently working, had no income, and could not afford his mortgage payment except by paying with student loans. He professed that he did not earn enough money, yet, as the trial court noted, somehow had the financial resources for lengthy international travel. Caseworkers testified that, despite numerous requests, respondent-father had not provided any verification of employment or income, other than one pay stub, and was vague about his work and school schedules.

The trial court's conclusion that respondent-father had minimal interest in parenting JDY was also supported by the record. Respondent-father refused, or at least neglected, to provide necessary care for JDY with his pattern of inconsistent and abbreviated visits, effectively abandoning JDY for long periods to the exclusive care of respondent-mother, which subjected JDY to a substantial risk of harm to his mental and physical well-being.

Accordingly, the evidence supported the trial court's finding by a preponderance of the evidence under MCL 712A.2(b)(1) that respondent-father neglected to provide proper care and custody for JDY as he did not make any effort to gain custody of JDY while knowing that JDY was at a substantial risk of harm in respondent-mother's care.

The preponderance of the evidence also justified the trial court's assumption of jurisdiction under MCL 712A.2(b)(2). Respondent argues on appeal that JDY "could have been properly serviced" through respondent-mother's case and by the DHHS assisting him with filing for custody. Contrary to respondent's assertion, the evidence established that the DHHS caseworkers repeatedly told respondent-father that he needed to contact the Friend of the Court and consult with an attorney for that purpose, which he failed to do. At the adjudication trial, respondent-father admitted that he had never contacted the Friend of the Court about obtaining custody of JDY despite being told he could so do, and similarly did not contact JDY's guardian ad litem to explore his custody options. Although respondent-father at times professed that he wanted to care for the child, when asked about seeking custody, he would deflect the inquiries by saying that he and respondent-mother had agreed that she would assume sole responsibility for raising JDY, and that his work schedule would interfere with caring for JDY. Respondent-father's alternative plans for the child were to have him raised by either his maternal grandparents in the United States, or by family members in Tanzania. Respondent-father added that petitioner's requirements concerning

JDY's care were not a part of his existing agreement with respondent-mother that she would care for JDY without any interference from him. Respondent-father further testified that he had told the maternal grandparents that "when you raise [JDY], we can all be proud of him," and added, "that's what I aspire to get to. Absent that, I do not want to waste time with foster care, supervision visits, and the sooner this matter gets closed, I think we'll be better off for it."

Additionally, respondent-father failed to take any steps to prepare a proper home environment for JDY. The evidence does not support respondent-father's argument that it was unnecessary for the court to assume jurisdiction over him because petitioner could have assisted him in preparing a home environment appropriate for JDY. At the adjudication trial, respondent-father admitted that his current home, a two-bedroom condominium, did not meet petitioner's requirements. One caseworker testified that respondent-father was unwilling to schedule a home assessment. A second caseworker who did complete a home assessment testified that respondent-father's home only had two bedrooms, and respondent-father had a roommate. Respondent-father indicated that he would sleep in the living room, while JDY would use his bedroom. However, the house was cluttered, needed to be child-proofed, and it did not have a crib or toddler bed. Further, respondent-father would not provide information about his roommate, for whom a background check was required. Respondent-father also did not voluntarily participate in family reunification services other than parenting classes. Therefore, it was respondent-father who refused the DHHS's attempts to prepare an appropriate home environment for JDY.[3]

Further, the evidence demonstrated that respondent-father had an extraordinarily inconsistent history of visitation with JDY. Before he was named as a father in the March 2023 petition, respondent-father was allowed supervised visitation, but his actual visits ranged from infrequent to nonexistent. One caseworker reported that, during a three-month period, respondent-father attended only one visit. Then, in the six months that followed, respondent-father did not see JDY at all, and never replied to a caseworker's attempts to schedule visits. When respondent-father did begin to visit JDY, he often cancelled visits and declined to reschedule them, or chose to end visits early. Respondent-father once told a caseworker that the scheduled one-hour visits were "not conducive to parenting," and once blamed JDY for finishing early by saying that JDY "was done with the visit." Moreover, respondent-father never asked for parenting time outside of what was scheduled.

Respondent-father testified regarding his limited interactions with JDY, explaining that "we do have a cultural difference," and that "I also have other responsibilities," including his involvement with a nonprofit organization to help children in Tanzania while pursuing a Ph.D. online. Respondent-father further stated that respondent-mother and the maternal grandparents never asked for his thoughts about raising JDY. When the trial court asked why he did not simply

_____

[3] It is also important to note that respondent-father failed to prepare a proper home for JDY despite knowing that respondent-mother's home was clearly unfit due to the domestic violence that JDY witnessed in her home. As mentioned previously, respondent-father testified at the adjudication trial that he had concerns about respondent-mother's behavior, including that respondent-mother had been violent toward him personally on several occasions in front of the children, and that he was frightened of her.

state what he wanted, respondent-father replied that he came from a different culture and was "hands-offish" to "avoid unnecessary duress." Respondent-father also explained that he has a Tanzanian passport and had been falsely accused of kidnapping JDY. He added that it was normal in his culture for a child to attend boarding school and not see a parent for several months, as was his own experience as a young child. We note, however, that respondent-father had lived in the United States for 20 years, and therefore find his claim that petitioner did not properly consider the cultural differences in parenting between his home country of Tanzania and the United States unpersuasive.

For these reasons, we conclude that the trial court did not clearly err by finding by a preponderance of the evidence that respondent-father was legally responsible for JDY, but neglected or refused to provide proper or necessary support for JDY and placed him at a substantial risk of physical and/or mental harm by failing to seek physical custody while JDY lived with respondent-mother. MCL 712A.2(b)(1). We further conclude that the trial court did not clearly err in finding by a preponderance of the evidence that respondent-father's home or environment was an unfit place for JDY as respondent-father refused to prepare his home for JDY, was unwilling to provide information about his roommate to the DHHS, and had a general lack of interest in parenting JDY. MCL 712A.2(b)(2).

Affirmed.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro